**William SHARP, Plaintiff,**

v.

**WASTE MANAGEMENT, INC.,
et al., Defendants.**

**Case No. 3:12–cv–421.**

United States District Court,
S.D. Ohio,
Western Division.

Signed Sept. 16, 2014.

Ted L. Wills, Cincinnati, OH, for Plaintiff.

Deborah S. Brenneman, George B. Musekamp, Thompson Hine LLP, Cincinnati, OH, Jennifer R., Asbrock, Thompson Hine LLP, Dayton, OH, for Defendants.

**ORDER GRANTING DEFENDANTS'. MOTION FOR SUMMARY JUDGMENT (Doc. 41) AND DENYING PLAINTIFF'S CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. 43)**

TIMOTHY S. BLACK, District Judge.

This civil action is before the Court on the parties' cross-motions for summary

judgment (Docs. 41, 43) and responsive memoranda (Docs. 48, 49, 53, 54).

## I. BACKGROUND FACTS

Plaintiff William Sharp alleges claims for workers' compensation retaliation in violation of Ohio Rev.Code § 4123.90, violations of the Americans with Disabilities Act ("ADA") and corresponding state law, violations of the Family and Medical Leave Act ("FMLA"), and willful termination in violation of Ohio public policy. Defendants include his former employer Waste Management of Ohio, Inc., and former managers James Profitt and Barry Saunders. Defendants move for judgment as a matter of law on all claims. Plaintiff filed a motion for partial summary judgment on his public policy claim.

## II. UNDISPUTED FACTS

Waste Management provides waste removal services for residential communities, businesses, governmental entities, and other organizations. Plaintiff was hired by Waste Management in December 2007 as a residential route driver, responsible for removing trash or other materials from a designated neighborhood route. (Doc. 42 at 34, 55). Drivers operate a 40-ton truck with a front or rear bucket and face daily physical demands. (Doc. 41, Ex. A at ¶ 2). Plaintiff worked directly under Barry Saunders, a route manager in charge of multiple drivers who served as his main point of contact. (Doc. 29 at 5). James Profitt was a senior district manager, in charge of approximately 200 employees and was Saunders' direct supervisor. (Doc. 33 at 6–7).

The employee handbook provides that employees must report all work-related injuries immediately to the supervisor and that failure to report an injury will result in discipline up to and including termination. (Doc. 42, Ex. 17 at 35). The handbook establishes a progressive-discipline program with the default discipline a written warning for failure to report an incident, but expressly provides that "each situation will be evaluated on a case-by-case basis and may result in escalating the progressive corrective action to a higher level, up to and including termination of employment on the first or second offense." (Id. at 36). If the regular manager was not at work, drivers and other employees were to report all injuries to another manager designated in advance who was responsible for all aspects of the employee's conduct that day. (Id. at 207).

Managers conduct safety meetings each morning and provide weekly safety training. (Doc. 41, Ex. A at ¶ 4). A Waste Management employee injury report is a one-page document that a manager may ask an employee to complete after an injury is verbally reported. (Doc. 42, Ex. 13). It asks the employee to provide the date, time and location of the incident, to describe the cause of the accident and the nature of the injury, and to provide the name of the manager notified and that date. (Id.) Finally, it asks the employee to indicate how he can avoid repeating the injury. (Id.) Plaintiff completed incident reports on two occasions after suffering an injury on the job, in December 10, 2009 and January 3, 2012. (Id., Exs. 4, 13). Plaintiff testified that he completed the reports because he knew it was a company rule to report any injury and he did not experience any negative actions after reporting. (Id. at 67, 78–79, 98–100).

Joe Krieger was a route manager at Waste Management until November 2010. (Doc. 47, Ex. 8). Krieger received a written coaching, the lowest form of corrective action, in March 2008, when a review of an employee's file revealed that Krieger failed to issue the employee a written warning for an incident documented in his

file. (Doc. 56, Ex. 46). The district manager reprimanded Krieger for not issuing the warning because the description of the incident in the report revealed that a warning was appropriate, and reminded Krieger he could consult himself with other supervisors if he needed assistance in determining whether a situation warranted corrective action. (*Id.*) Krieger received a written coaching in December 2009, because drivers under his supervision accounted for a disproportionate amount of incidents in the district, and then received a written warning in April 2010. (Doc. 47, Ex. 7). The warning acknowledged that "not all of the incidents were preventable," but urged Krieger to emphasize safety to employees under his control. (*Id.*)

Krieger was terminated in November 2010 for failure to report an incident to his supervisors. (Doc. 47, Ex. 8). A driver damaged a customer's mailbox and immediately informed Krieger over the radio, who went to speak with the home owner. (Doc. 35 at 8). Krieger prepared an incident report the same day, but failed to obtain an incident report from the driver and failed to issue the driver a written warning. (*Id.* at 37–38, Ex. 44 at WM 2741). Saunders overheard the initial report over the radio from the driver and suspected that Krieger failed to properly report the incident as required. (Doc. 29 at 182–85). Saunders and another route manager investigated the incident and discovered that the driver did damage a mailbox. (*Id.* at 185–86). Based on Saunders' report, the district manager investigated and determined that Krieger failed to properly report and document the incident. (Doc. 47, Ex. 8). The termination notice provided that the district manager asked Krieger about the incident, but Krieger indicated that he would only speak with him after the district manager returned from a business meeting out of town. (*Id.*) Shortly thereafter the district manager decided that the seriousness of Krieger's failure to report justified immediate termination. (Doc. 36 at 22–23; Doc. 47, Ex. 8).

Plaintiff took FMLA leave three times between 2009 and 2011. (Doc. 42, Exs. 3, 6, 9). Plaintiff encountered no problems receiving company approval for these leaves, and no one made any negative comments upon his return. (Doc. 42 at 82, 94–95). Waste Management accommodated his medical restrictions each time, and Plaintiff testified that he felt no negative repercussions. (*Id.* at 73–74, 94–95).

On March 27, 2012, Saunders was not working and Kenny Lane, another route manager, was designated as Plaintiff's manager for the day. (Doc. 42 at 103). During his route, Plaintiff encountered two big tree stumps that a customer left out for pickup. (*Id.*) Plaintiff contacted Lane by radio, and Lane instructed him to pick up the stumps. (*Id.*) Immediately after getting both stumps into the truck, Plaintiff attempted to contact Lane again but his radio was turned off and Plaintiff was unable to contact him for the rest of the day. (*Id.*) Plaintiff completed the remaining six hours of his shift and did not mention a back injury to any other employees that day. (*Id.* at 111).

Lane also served as Plaintiff's manager on March 28, 2012. (Doc. 42 at 69). Saunders returned to work on March 29, 2012. (*Id.* at 214). Plaintiff did not report a back injury to Profitt in March 2012, and he did not report that Lane or Saunders ignored his attempts to report an injury. (*Id.* at 71). Saunders took his own FMLA leave during portions of April and May 2012. (Doc. 30 at 22–23).

The first medical treatment Plaintiff sought after March 27, 2012 was when he went to the emergency room on April 18, 2012. (Doc. 42 at 176). A doctor and physician's assistant treated him, and their

respective medical records provide that Plaintiff reported he could not attribute his back pain to any specific event and that he described the pain as commencing six months prior. (*Id.*, Exs. 27–28). The physician assistant's record provides that Plaintiff reported that his employment duties "aggravated his discomfort recently," but specifically notes that Plaintiff stated his back pain commenced six months earlier. (*Id.*, Ex. 28 at 1).

Plaintiff then saw his family physician, Dr. Myers, on April 24, 2012. (Doc. 42, Ex. 29). The medical records completed by Dr. Myers do not reference a specific source for Plaintiff's back injury. (*Id.*) Four insurance claims forms submitted for Plaintiff's visits to Dr. Myers expressly indicate that the purpose of his visit was not related to an employment injury. (*Id.*, Ex. 30). Dr. Myers referred Plaintiff to Dr. Taha, a neurosurgeon specialist, and Dr. Taha's letter dated May 2, 2012 recounts that Plaintiff stated his back pain began the prior year and listed a fall from a ladder twenty years earlier as a relevant factor. (*Id.*, Ex. 31).

Plaintiff continued to work until his visit to the emergency room on April 18, 2012. (Doc. 42 at 121). Thereafter, Waste Management duly approved Plaintiff's FMLA leave, the fourth leave during his five-year employment, and Plaintiff had back surgery on May 19, 2012. (Doc. 41, Ex. A–2; Doc. 42 at 116). Plaintiff made several unsuccessful attempts to call Saunders before his back surgery (Doc. 43, Ex. 1 at ¶ 14), and his wife made unsuccessful calls to HR personnel on May 22, 2012 and July 31, 2012. (Doc. 43, Ex. 42 at ¶¶ 45–49). Plaintiff spoke with Saunders at the end of July to coordinate his return from leave. (Doc. 42 at 169, 218). Dr. Taha cleared Plaintiff to return to work on August 6, 2012 with a restriction to lift no more than 50 pounds. (Doc. 29, Ex. 29; Doc. 42 at 116–17). Waste Management honored these restrictions and assigned Plaintiff as a driver. (Doc. 42 at 117; Doc. 47, Ex. 1 at ¶ 89). Plaintiff testified that he did not hear any negative comments related to his leave and felt no negative effects. (*Id.*)

On August 15, 2012, Plaintiff filed for workers' compensation and listed his injury as occurring on March 27, 2012. (Doc. 47, Ex. 10). Plaintiff did not inform anyone at Waste Management that he had filed a workers' compensation claim until October 23, 2012. (Doc. 29 at 87; Doc. 42 at 118).

On September 10, 2012, Dr. Taha responded to a request from the Bureau of Workers' Compensation for information related to his examinations of Plaintiff. (Doc. 42, Ex. 33). Dr. Taha indicated there was "no specific cause reported" as the source of Plaintiff's back injury and provided that he never diagnosed the injury as work related. (*Id.*) Plaintiff testified that he had no involvement with Dr. Taha's completion of the form. (*Id.* at 190–92). Plaintiff subsequently visited Dr. Taha for a follow-up visit on October 17, 2012, and Dr. Taha wrote a letter to Saunders restating the 50–pound lifting restriction. (Doc. 42, Ex. 35). After Plaintiff gave the letter to Saunders, he testified that Waste Management continued to provide the necessary accommodations. (*Id.* at 194).

Plaintiff called Waste Management's third-party attendance administrator, Time Off Planning System ("TOPS"), on October 17, 2012 to report a work absence and attributed it to a work injury. (Doc. 47, Ex. 47 at WM 4475). Employee absences reported to TOPS as attributed to work injuries are forwarded to Waste Management's risk management team. (Doc. 36 at 44). The risk management team then cross-checks these absences with the database of work-related injury claims to ensure that all injuries are prop-

erly documented and investigated. (*Id.* at 44). Injury claims are created through Waste Management's third-party claims administrator, Gallagher Bassett. (Doc. 36 at 27). As the employee handbook requires, employees must report all work-related injuries to a manager. (Doc. 42, Ex. 17 at 35).

On Monday, October 22, 2012, HR employees in Waste Management's corporate office realized that there was not an injury claim documenting the work-related injury Plaintiff reported to TOPS on October 17. (Doc. 37 at 139–40; Doc. 47, Ex. 47 at WM 4475). When this occurs, the corporate HR department contacts the regional HR and safety departments to investigate if an injury did occur or if the employee made a mistake with the TOPS automated system. (Doc. 37 at 139–40). Gretchen Busch, a regional HR manager, confirmed that there was no injury report on file and contacted Saunders to address the issue with Plaintiff directly. (Doc. 36 at 44–45).

Saunders and Plaintiff met several times on October 23, 2012. They first spoke in Saunders' office when Plaintiff arrived at work. (Doc. 29, Ex. 12; Doc. 42 at 118). Plaintiff told Saunders that he did claim his absence was due to a work-related injury and informed Saunders about his workers' compensation claim. (Doc. 29, Ex. 12; Doc. 42 at 118). Plaintiff stated that he did not inform Saunders about his workers' compensation claim earlier because he was afraid of losing his job. (Doc. 29, Ex. 12; Doc. 33 at 20; Doc. 42 at The meeting did not last long and Plaintiff left to begin his route. (Doc. 29, Ex. 12; Doc. 42 at 118). Saunders then approached Profitt for guidance on how to properly handle an incident reported seven months after it occurred, which is when Profitt first learned about Plaintiff's workers' compensation claim. (Doc. 33 at 11).

Plaintiff spoke over the radio with Saunders, Profitt, and Busch at approximately 1:30 p.m. on October 23, 2012. (Doc. 29 at 154–55; Doc. 36 at 75; Doc. 42 at 128–30). The conversation culminated in Saunders sending another driver to pick up Plaintiff and drive him back to the office. (Doc. 29, Ex. 12; Doc. 36 at 77–78; Doc. 42 at 129–31).

Upon returning to the office on October 23, 2012, Plaintiff met with Saunders in his office. (Doc. 29, Ex. 12; Doc. 42 at 131–35). Although there is conflicting testimony about several aspects of the meeting, it is undisputed that Saunders asked Plaintiff to complete an incident report related to his claimed injury before Plaintiff left his office that day, Plaintiff said he would complete the incident report only if he could bring it home to review with his attorney, and that Plaintiff left the meeting without completing the report and without a blank copy. (Doc. 29 at 71–76; Doc. 42 at 131–35). At the conclusion of the meeting, Saunders told Plaintiff to not report to work the next day. (Doc. 29 at 13–14). Saunders called Plaintiff on October 24, 2012 to tell him not to report the next day, and then on October 25, Saunders called again and told Plaintiff to report to his office the next morning.

Saunders and Profitt consulted with Busch and other managers after the meeting on October 23, 2012 to determine how to handle Plaintiff's claimed injury and what to do about his refusal to complete the injury report when asked. (Doc. 33 at 58–66; Doc. 36 at 60–63). While the investigation and discussions continued, Profitt testified that his mind was already "95% made up to term[inate] for non-report of an incident." (Doc. 33 at 161).

Saunders began the process to document the incident on October 24, 2012. He called a representative at Gallagher Bassett, Waste Management's third-party

administrator for insurance claims, which automatically generated a document he referred to as an "incident report." (Doc. 47, Ex. 47). This document is created solely from information the manager provides over the phone. (Doc. 30 at 9; Doc. 37 at 144). The representative enters the information provided into the Ohio Bureau of Workers' Compensation first injury report template and then the report is automatically emailed to the manager. (Doc. 30 at 9; Doc. 37 at 143; Doc. 47, Ex. 47). The report produced from Saunders' call on October 24, 2012, based solely on the information Plaintiff gave on October 23, 2012, provided only that Plaintiff "sustained a re-aggravation of previous back injury due to loading trash" and listed the date of the accident as October 23, 2012. (Doc. 47, Ex. 47 at WM 4470).

Plaintiff contacted his attorney before returning to the office, and the attorney drafted a letter to Saunders dated October 25, 2012. (Doc. 5, Ex. A). The letter set forth an approximate version of the underlying facts alleged in this action, stated that the attorney concluded that Waste Management constructively discharged Plaintiff based on the facts he alleged, and claimed that this discharge violated Plaintiff's rights under the four legal provisions pursued here. (*Id.*)

Plaintiff gave the letter to Saunders on the morning of October 26, 2012, and after reading it, Saunders left his office to get Profitt. (Doc. 29 at 96; Doc. 42 at 135). When Saunders and Profitt returned, they asked Plaintiff for the second time to complete an injury report before leaving his office. (Doc. 29 at 100–01; Doc. 33 at 50–51; Doc. 42 at 135–39). Plaintiff said he would only complete the injury report if his attorney was present and left without completing it. (Doc. 29 at 100–01; Doc. 33 at 50–51; Doc. 42 at 135–39). During the meeting Plaintiff did not claim that he previously tried to report the injury to Lane or Saunders in March or to anyone else thereafter. (Doc. 42 at 138).

Saunders and Profitt immediately contacted Busch to discuss the meeting with Plaintiff and forwarded her the attorney's letter. (Doc. 47, Ex. 34). These three consulted extensively amongst themselves and with other Waste Management employees, including Assistant General Counsel Kimberly Stith, between Plaintiff's first report of the injury on October 23 and the decision to terminate him on October 29, 2012. (Doc. 33 at 57–70, 158–66; Doc. 36 at 54–63).

### III. STANDARD OF REVIEW

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56; *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

"Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Keweenaw Bay Indian Comm. v. Rising,* 477 F.3d 881, 886 (6th Cir.2007) (quoting Fed.R.Civ.P. 56(c)).

"Weighing of the evidence or making credibility determinations are prohibited at summary judgment—rather, all facts must be viewed in the light most favorable to the non-moving party." *Id.*

Once "a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading." *Viergutz v. Lucent Techs., Inc.,* 375 Fed.Appx. 482, 485 (6th Cir.2010) (citation omitted). Instead, the party opposing summary judgment "must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." *Id.* (citation omitted).

Further, Rule 56(c) states that "[a] party asserting that a fact ... is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record ... or ... showing that the material cited do not establish the absence ... of a genuine dispute." Where "a party fails ... to properly address another party's assertion of fact as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion." Fed.R.Civ.P. 56(e)(2).

## IV. STATE LAW CLAIMS

### A. Workers' Compensation Retaliation

█ Plaintiff's first claim alleges that Defendants terminated him in retaliation for filing a workers' compensation claim in violation of Ohio Rev.Code § 4123.90.[1] The parties agree that Plaintiff must establish a *prima facie* case, but disagree as to the elements an Ohio court would apply, based on a split in the Ohio appellate courts. *See Ferguson v. SanMar Corp.,* No. CA2008–11–283, 2009 WL 2489258, at *3 (Ohio App. Aug. 17, 2009). Defendants urge the Court to require Plaintiff to establish he (1) was injured on the job; (2) filed a workers' compensation claim; and (3) suf-

fered an adverse employment action as a result. *Id.* Plaintiff argues that the proper formulation requires him to demonstrate that (1) he engaged in a protected activity; (2) suffered an adverse employment action; and (3) a causal connection between the protected activity and the adverse employment action. *Id.*

In determining Ohio law, the Court must first look to final decisions of the Supreme Court of Ohio. *Savedoff v. Access Grp., Inc.,* 524 F.3d 754, 762 (6th Cir.2008). As discussed in *Ferguson,* the most recent Supreme Court of Ohio case interpreting the elements of a claim under the statute is *Wilson v. Riverside Hosp.,* 18 Ohio St.3d 8, 479 N.E.2d 275 (1985). The court held that "a complaint filed by an employee against an employer states a claim for relief for retaliatory discharge when it alleges that the employee was injured on the job, filed a claim for workers' compensation and was discharged by that employer in contravention of [Ohio Rev.Code § ]4123.90." *Id.* at 277. The Ohio appellate court in *Ferguson* rejected the inclusion of injury on the job as an element of a *prima facie* case under § 4123.90, and acknowledged that it broke from the approach "followed by a majority of Ohio courts." *Ferguson,* 2009 WL 2489258, at *3–4. The court distinguished the Supreme Court of Ohio's holding in *Wilson* on the basis that it provides only that the plaintiff must allege injury on the job to survive a motion to dismiss, and did not state it as an element of a *prima facie* case at the summary judgment stage. *Id.* The appellate court found further support for the latter formulation in an intervening Supreme of Ohio Court case stating the

---

**1.** Ohio Rev.Code § 4123.90 provides that "[n]o employer shall discharge, demote, reassign, or take any punitive action against any employee because the employee filed a claim or instituted, pursued or testified in any pro-

ceedings under the workers' compensation act for an injury or occupational disease which occurred in the course of and arising out of his employment with that employer."

elements of a *prima facie* case under § 4112.02(I), Ohio's anti-retaliation provision. *Id.* (citing *Greer–Burger v. Temesi*, 116 Ohio St.3d 324, 879 N.E.2d 174, 180 (2007)).

■ Decisions of Ohio appellate courts are "viewed as persuasive unless it is shown that the state's highest court would decide the issue differently." *Savedoff*, 524 F.3d at 762. This Court agrees that *Wilson* does not directly hold that injury on the job is an element of the *prima facie* case. Nonetheless, it is a reasonable extension that a plaintiff at the summary judgment stage must present proof to support the same elements he needed only allege in his pleading. Moreover, *Ferguson* demonstrates that nine of the twelve Ohio appellate courts require injury on the job as an element of a *prima face* case. *Ferguson*, 2009 WL 2489258, at *3 (collecting cases).

This Court finds further support for requiring Plaintiff to establish injury on the job from a more recent Supreme Court of Ohio case. In *Sutton v. Tomco Mach., Inc.*, 129 Ohio St.3d 153, 950 N.E.2d 938 (2011), the issue was whether there is a cause of action under § 4123.90 for an employee terminated after his injury but before he filed for workers' compensation. Although the ultimate holding that public policy provides a cause of action during the gap between injury and filing is not dispositive here, the Supreme Court's framing of the issue in *Sutton* and its discussion of legislative intent is instructive. First, the court framed the inquiry as whether § 4123.90 applies "when an *injured employee* suffers retaliatory employment action after *injury on the job* but before the employee files a workers' compensation claim." *Sutton*, 950 N.E.2d at 947 (emphasis added). The court determined that the legislature "did not intend to a leave a gap in protection" between injury and fil-

ing because § 4123.90 "expresses a clear public policy prohibiting retaliatory employment action against injured employees, including injured employees who have not filed." *Id.* at 945–46. The court stressed the importance of looking to the statutory language, and § 4123.90 prohibits adverse employment action against an employee who proceeds "under the workers' compensation act for an *injury* or occupational disease *which occurred in the course of and arising out of his employment* with that employer." Further, the court declined to adopt the rule that close proximity between injury and discharge creates a presumption of retaliation because "a discharge could be for reasons other than those related to workers' compensation, such as a reasonable suspicion that the injury was not job related [or] a disregard by the employee for the employer's safety rules." *Id.* at 943.

■ Finally, the Supreme Court in *Sutton* expressly contrasted the remedies available for a discriminatory retaliation claim under § 4112 with those available for workers' compensation retaliation under § 4123.90. *Sutton*, 950 N.E.2d at 947–48. The Ohio Workers Compensation Act is "premised on the recognition that industrial accidents are inevitable and that employees injured in the course of their employment ought to be able to recover certain damages." *Id.* at 948. Accordingly, this Court concludes that the Supreme Court of Ohio would require injury on the job as an element of a *prima facie* case of workers' compensation retaliation under § 4123.90.

■ Therefore, Plaintiff must demonstrate that he: (1) was injured on the job; (2) filed a workers' compensation claim; and (3) suffered an adverse employment action in contravention of Ohio Rev.Code § 4123.90. *Rivers v. Cashland*, No. 26373, 2013 WL 1286127, at *3 (Ohio App. Mar.

29, 2013). Here, Plaintiff is unable to meet his burden of demonstrating he was injured on the job. Multiple sources of contemporaneous evidence provide that Plaintiff repeatedly denied his back injury was work related. Plaintiff alleges that his injury occurred at work on March 27, 2012 and repeatedly described it as an "explosion of pain" in his testimony. (Doc. 42 at 103). It is undisputed that Plaintiff worked the entire rest of his shift that day and for the next three weeks. (Doc. 42 at 121). He did not seek medical treatment until he visited the emergency room on April 18, 2012. (*Id.* at 176). It is also undisputed that the medical records of four medical professionals who treated Plaintiff, three doctors and a physician's assistant, all provide that Plaintiff was unable to attribute his back pain to any specific event, much less a single "explosion of pain," and that he described the symptoms as starting six months prior. (*Id.*, Exs. 27–29, 31). The physician assistant's record provides that Plaintiff reported that his employment duties "aggravated his discomfort recently," but specifically notes that Plaintiff stated his back pain commenced six months earlier. (*Id.*, Ex. 28 at 1). Four insurance claim forms for Plaintiff's visits to Dr. Myers expressly provide that he did not seek treatment for an employment injury. (*Id.*, Ex. 30).

Plaintiff testified that he actually informed these four medical professionals that his back pain resulted from lifting the tree stumps at work on March 27, 2012. (Doc. 42 at 115, 176–82, 188, 210–11). He further testified that all four agreed to his request to omit all references to a work injury from the medical record and instead describe it as a long-term injury because Plaintiff feared he would lose his job if Waste Management discovered he was hurt at work. (*Id.*)

Plaintiff's testimony that these medical professionals agreed to put inaccurate information in his medical record is dubious on its face, but Plaintiff's credibility is irreparably undermined by the portions of the medical record that evidences a long-term injury (and as to which he admitted in his testimony). Specifically, Dr. Taha's letter provides that "symptoms followed falling 20 years ago." (Doc. 42, Ex. 31). Plaintiff testified that he fell from a ladder while working as a window cleaner about twenty years earlier (*Id.* at 101), but denied ever mentioning this to a doctor. (*Id.* at 102). Dr. Taha also listed chiropractic manipulation as a past treatment for his back injury (*Id.*, Ex. 31), which Plaintiff also denied even having received. (*Id.* at 102, 187–88).

Plaintiff's testimony is further impeached by Dr. Taha's response to the workers' compensation commission's request for medical records that he signed under oath on September 10, 2012. (Doc. 42, Ex. 33). Dr. Taha responded to a question about the history of the injury with "no specific cause reported" and indicated that he determine the injury was not employment related. (*Id.*) Plaintiff testified that he had no involvement with Dr. Taha's completion of the form. (*Id.* at 190–92). Accordingly, Plaintiff has failed to demonstrate a material factual dispute of whether he suffered an injury on the job.

 Plaintiff also fails on the causation element. While discussing the causation element of a public policy workers' compensation retaliation claim, the Ohio Supreme Court of Ohio specifically identified "reasonable suspicion that the injury was not job related [or] a disregard by the employee for the employer's safety rules" as destroying a causal connection. *Sutton,* 950 N.E.2d at 943. Here, Plaintiff is un-

able to produce evidence sufficient to establish causation.

## B. Wrongful Discharge in Violation of Public Policy

█ Plaintiff alleges that he was wrongfully discharged in violation of Ohio public policy. A plaintiff must prove the following elements to prevail on a public policy claim: (1) a clear public policy exists and is manifested in a state or federal constitution, in statute or administrative regulation, or in the common law (the clarity element); (2) dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element); (3) the plaintiff's dismissal was motivated by conduct related to the public policy (the causation element); and (4) the employer lacked an overriding legitimate business justification for the dismissal (the overriding justification element). *Sutton v. Tomco Mach., Inc.,* 129 Ohio St.3d 153, 950 N.E.2d 938, 943 (2011). The clarity and jeopardy elements involve questions of law, whereas the causation and overriding justification elements involve questions of fact. *Id.*

█ It is clear that "terminating an employee for consulting an attorney regarding the merits of a suit that would affect the employer's interest is a violation of public policy in Ohio." *Chapman v. Adia Servs., Inc.,* 116 Ohio App.3d 534, 688 N.E.2d 604, 610 (1997). The same Ohio appellate court subsequently clarified that *Chapman* holds that "Ohio's public policy prohibits an employee from being fired solely for consulting an attorney," *Boyd v. Winton Hills Med. & Health Ctr., Inc.,* 133 Ohio App.3d 150, 727 N.E.2d 137, 143 (1999), and later declined to extend the public policy to protect employees who actually file suit against their employer. *Taylor v. Volunteers of Am.,* 153 Ohio

App.3d 698, 795 N.E.2d 716, 719 (2003). The court reasoned that further extension of the public policy identified in *Chapman* would "disrupt the balance of the employer-employee relationship" and created the "danger that an employee, anticipating an adverse job action due to poor performance would file suit against his employer as a 'preemptive strike' against termination." *Id.* This balance preserved the right of an employee to "consult an attorney to determine his rights and remedies under the law," while not disrupting the ability of the employer to continue legitimate business practices such as providing performance evaluations. *Id.*

█ Federal courts have also recognized that the public policy announced in *Chapman* protects the right of an employee to consult an attorney "outside the workplace," *Plona v. UPS,* No. 1:06–cv–1144, 2007 WL 509747, at *3 (N.D.Ohio Feb. 13, 2007), and that *Chapman* "does not state that an Ohio public policy exists entitling employees to have an attorney present at meetings with his or her employer." *Bickley v. FMC Techs., Inc.,* 282 F.Supp.2d 631, 642 (N.D.Ohio 2003). Further, "Ohio does not support a right to be represented by counsel at meetings with one's employer, and it certainly does not give employees (or their attorneys) the right to dictate the terms of those meetings." *Maiden v. Indiana & Ohio Ry. Co.,* 353 F.Supp.2d 952, 956–57 (N.D.Ohio 2005).

█ Here, Plaintiff satisfies the clarity and jeopardy elements because he alleges that Defendants terminated him solely for consulting an attorney. However, he cannot establish the causation or overriding justification elements. The public policy protects the right of an employee to consult with an attorney outside the workplace. To extend it any further would disrupt the "proper balance between

the employee's interest in protecting recognized rights and the employer's interest in maintaining a loyal and responsive workforce." *Taylor*, 795 N.E.2d at 719. An employee may not disrupt legitimate requests of an employer by making his compliance contingent on the assistance or presence of an attorney. "Ohio does not support a right to be represented by counsel at meetings with one's employer, and it certainly does not give employees (or their attorneys) the right to dictate the terms of those meetings." *Maiden*, 353 F.Supp.2d at 956–57.

Construing the facts in the light most favorable to Plaintiff, Defendants' actions do not violate Ohio public policy. It is undisputed that Plaintiff did not complete the incident report during the meetings on October 23 and October 26, 2012. Defendants knew that Plaintiff consulted with an attorney in conjunction with his workers' compensation claim and did not terminate him immediately because of that. Instead, Defendants' proffered reason was that Plaintiff sought to have his attorney intrude into the workplace and prohibited the company from performing an internal investigation into an employee injury. Finally, Defendants operate in an inherently dangerous industry and the need to ensure employee safety could serve as an overriding legitimate business justification. *See Sutton*, 950 N.E.2d at 943 (observing that "disregard by the employee for the employer's safety rules" could defeat a public policy claim). Accordingly, Defendants are entitled to judgment as a matter of law of Plaintiff's state law claims.

## V. FEDERAL CLAIMS

All of Plaintiff's claims are evaluated pursuant to the *McDonnell Douglas* burden-shifting framework. First, Plaintiff must establish a *prima facie* case of discrimination or retaliation under the particular law. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir.2000). If Plaintiff succeeds, there is a presumption of discrimination or retaliation, and the burden shifts to Defendants to articulate a legitimate, nondiscriminatory reason for the employment action. *Id.* at 573. Plaintiff must then rebut this reason by showing the proffered reason was pretext to hide Defendants' unlawful discrimination or retaliation. *Id.*

### A. ADA Claims

Plaintiff pled claims under the ADA and Ohio disability law for disability discrimination and retaliation.[2] Plaintiff does not respond to Defendants' argument that they are entitled to judgment as a matter of law on his claim for disability discrimination and appears to have conceded the claim.[3] The Court will nonetheless analyze the claim under both theories.

#### 1. Disability Discrimination

To make out a *prima facie* case of employment discrimination under Title I of the ADA, a plaintiff must show that "1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought

---

**2.** Plaintiff's claims under Ohio law are analyzed under the same framework as his ADA claim. *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1104 n. 3 (6th Cir.2008). Profitt and Saunders are not personally liable under the ADA because they do not meet the statutory definition of an "employer." *Sulli-*

*van v. River Valley Sch. Dist.*, 197 F.3d 804, 808 n. 1 (6th Cir.1999).

**3.** This interpretation is buoyed by Plaintiff's own claim that Defendants failed to address his ADA retaliation claim.

other applicants or the disabled individual was replaced." *Whitfield v. Tennessee,* 639 F.3d 253, 258–59 (6th Cir.2011) (quoting *Monette v. Elec. Data Sys. Corp.,* 90 F.3d 1173, 1186 (6th Cir.1996)). Ultimately, the employee must prove that his disability was the "but-for" cause of the adverse employment action. *Lewis v. Humboldt Acquisition Corp.,* 681 F.3d 312, 321 (6th Cir.2012) (en banc).

The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Plaintiff's memorandum *contra* makes no attempt to argue that he is disabled as defined under the ADA, but the Court will entertain the theory Plaintiff presented in his deposition that Defendants "regarded" him as disabled. (Doc. 42 at 16–20). Plaintiff testified that Saunders regarded him as disabled on October 23, 2012 when he ordered Plaintiff to pull his truck over and sent another employee to pick him up. (*Id.*)

■ The ADA further clarifies the "regarded as" disabled language used in paragraph 1(C):

> (A) An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.
> B) Paragraph (1)(C) shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less.

42 U.S.C. § 12102(3). It is undisputed that Defendants assigned Plaintiff as a driver upon his return from leave in August until October 23, 2012, and Plaintiff testified that no one made any negative comments about his ability to perform that work. (Doc. 42 at 117). Accepting as true Plaintiff's contention that Saunders said he was "unfit to be behind the wheel" in the afternoon of October 23, 2012, Plaintiff still fails to establish that Saunders "regarded" Plaintiff as disabled. It is undisputed that Saunders knew about Plaintiff's workers' compensation claim on the morning of October 22, 2012, yet still ordered Plaintiff to drive his route. They also spoke at least one other time before Plaintiff was removed from his route. (Doc. 42 at 127). Even after construing the evidence in the light most favorable to Plaintiff, this amounts to nothing more than a "transitory and minor impairment," which is insufficient as a matter of law. 42 U.S.C. § 12102(3)(B).

### 2. ADA Retaliation

■ A *prima facie* case of ADA retaliation requires a showing that (1) the plaintiff engaged in protected activity; (2) the employer knew of that activity; (3) the employer took an adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *Rorrer v. City of Stow,* 743 F.3d 1025, 1046 (6th Cir.2014).

■ The ADA contains an opposition clause and a participation clause mirroring that in Title VII. *Vorachek v. Sec. Fed. Credit Union,* No. 07–15090, 2009 WL 4506440, at *6 (E.D.Mich. Dec. 1, 2009). In the context of Title VII, the distinction matters because "federal courts have generally granted less protection for opposition than for participation in enforcement proceedings." *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1312 (6th Cir.1989). Protection attaches if the

manner of opposition is reasonable and is based on a reasonable and good faith belief that the challenged conduct is unlawful. *Johnson*, 215 F.3d at 579. However, "[a]n employee is not protected when he violates legitimate rules and orders of his employer." *Booker*, 879 F.2d at 1312.

■ Here, the sole protected conduct Plaintiff identifies is giving his attorney's letter to Saunders on October 26, 2012. The letter claimed that Waste Management constructively discharged him and asserted that this violated Plaintiff's rights under the ADA and the three other laws at issue in this action. (Doc. 5, Ex. A). A letter to an employer constitutes protected activity if it opposes unlawful activity with some specificity, as opposed to merely a "vague charge of discrimination." *Stevens v. Saint Elizabeth Med. Ctr., Inc.*, 533 Fed.Appx. 624, 631 (6th Cir.2013). The letter names the four employments laws and concludes that they were violated, which typically is sufficient to qualify as protected activity. *Id.* However, the activity is only protected if the person opposing the conduct has a reasonable and good faith belief it is unlawful, which requires a subjective analysis. *Johnson*, 215 F.3d at 579.

■ Plaintiff suffered an adverse employment action when Defendants discharged him on November 2, 2012, one week after he engaged in ADA protected activity. Plaintiff argues that this temporal proximity alone is sufficient to demonstrate a causal connection. However, "where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir.2008). The Court need not conclusively decide whether Plaintiff estab-

lished the causation element because he cannot demonstrate that Defendants' legitimate, nondiscriminatory reasons are pretext.

## B. FMLA Claims

■ An employee may allege violations of the FMLA under the entitlement theory or retaliation theory. *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507–08 (6th Cir.2006). The entitlement theory, also known as the interference theory, arises from the provision that it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA. 29 U.S.C. § 2615(a)(1); *Edgar*, 443 F.3d at 507. The retaliation theory, sometimes referred to as the discrimination theory, is premised on § 2615(a)(2), which makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA. *Edgar*, 443 F.3d at 508.

Plaintiff pled violations under both theories, but only responds to Defendants' arguments with regard to the retaliation theory. As with his ADA claim, Plaintiff has likely abandoned his entitlement theory claim, but the Court will nonetheless analyze it.

### 1. FMLA Entitlement Claim

■ To prevail on an entitlement claim, an employee must prove that: (1) he was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) he was entitled to leave under the FMLA; (4) he gave the employer notice of his intention to take leave; and (5) the employer denied the employee FMLA benefits to which he was entitled. *Edgar*, 443 F.3d at 507.

■ In his deposition, Plaintiff testified that he gave notice that he might need

future FMLA leave and that Defendants terminated him to prevent him from getting that future leave. (Doc. 42 at 20–21). However, an employer's intent is not relevant under the entitlement theory because the only issue is only whether the employer denied benefits the employee was entitled to receive. *Edgar,* 443 F.3d at 507. Plaintiff makes failed to produce evidence that he was entitled to FMLA leave based on a speculative future injury. Accordingly, his claim fails as a matter of law under the entitlement theory. *See Seeger v. Cincinnati Bell Tel. Co.,* 681 F.3d 274, 283 (6th Cir.2012).

### 2. *FMLA Retaliation Claim*

 To establish a *prima facie* case of FMLA retaliation, an employee must show that (1) he was engaged in an activity protected by the FMLA; (2) his employer knew that he was exercising his FMLA rights; (3) he suffered an adverse employment action; and (4) a causal connection existed between the protected activity and the adverse employment action. *Seeger,* 681 F.3d at 283.

Like the ADA, the FMLA contains an opposition clause derived from Title VII. *Pulczinski v. Trinity Structural Towers, Inc.,* 691 F.3d 996, 1005 (8th Cir.2012). Plaintiff argues that the assertions in the letter from his attorney that Defendants violated his FMLA rights amounts to protected activity. Much like the ADA, the FMLA prohibits retaliation against an individual who opposes FMLA violations. 29 U.S.C. § 2615(a)(2). The Department of Labor's regulations provide that "[i]ndividuals, and not merely employees, are protected from retaliation ... if they oppose any practice which they reasonably believe to be a violation of the Act or regulations." 29 C.F.R. § 825.220(e). "The few courts that have interpreted this provision have found that a plaintiff states

a valid retaliation claim where she opposes a practice she reasonably, but incorrectly, believes violates the FMLA." *Fries v. TRI Mktg. Corp.,* Civ. No. 11–1052, 2012 WL 1394410, at *8 n. 7 (D.Minn. Apr. 23, 2012) (collecting cases). Perhaps a heightened standard is appropriate when an attorney does the opposition, but the Court need not conclusively address that issue or causation because Plaintiff cannot evidence pretext.

### C. Pretext

 Defendants' proffered reasons for terminating Plaintiff are his failure to report the alleged injury, either verbally or in writing, for almost seven months, and insubordination when he twice refused to complete an incident report after Defendants learned of the injury from his workers' compensation claim. Plaintiff may show that this legitimate nondiscriminatory reason is a pretext for retaliation by showing that the proffered reason: (1) has no basis in fact; (2) did not actually motivate the employer's challenged conduct; or (3) was insufficient to warrant the challenged conduct. *Clay v. UPS,* 501 F.3d 695, 704 (6th Cir.2007). The Sixth Circuit has retreated from formulaic application of these categories and stresses that they serve only as a tool to assist in the Court in addressing the ultimate inquiry: "did the employer fire the employee for the stated reason or not?" *Chen v. Dow Chem. Co.,* 580 F.3d 394, 400 n. 4 (6th Cir.2009).

 "[A] case alleging unlawful retaliation is not a vehicle for litigating the accuracy of the employer's grounds for termination. Instead, the employee also must offer some evidence that not only were the employer's reasons false, but that retaliation was the real reason for the adverse action." *Tingle v. Arbors at Hilliard,* 692 F.3d 523, 530 (6th Cir.2012).

### 1. Proffered reason has no basis in fact

An employer may avoid a finding that its proffered nondiscriminatory reason was pretextual by invoking the honest belief rule. This requires the employer to "establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir.1998). In determining whether an employer reasonably relied on the particularized facts then before it, courts "do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 708 (6th Cir.2006). "As long as the employer held an honest belief in its proffered reason, the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless." *Seeger*, 681 F.3d at 285–86.

To prove pretext, the employee must allege "more than a dispute over the facts upon which the discharge was based. He must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493–94 (6th Cir.2001). If the employee is able to "produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process 'unworthy of credence,' then any reliance placed by the employer in such a process cannot be said to be honestly held." *Smith*, 155 F.3d at 807–08. The employee may make this showing, for example, by demonstrating "an error on the part of the employer that is too obvious to be unintentional." *Seeger*, 681 F.3d at 286.

Plaintiff first argues that he did actually report his injury and therefore Defendants' proffered failure-to-report reason is false. Even if the Court accepts as true the facts alleged by Plaintiff, this is insufficient to show that Defendants lacked an honest belief. According to Plaintiff's testimony, Lane turned off his radio after Plaintiff picked up the tree stumps and he was unable to contact Lane for the remainder of the day on March 27, 2012. (Doc. 42 at 106). The next morning, Plaintiff attempted to speak with Lane just as he was exiting his office for a meeting, but Plaintiff admits that Lane rushed off before Plaintiff was able to speak with him. (*Id.* at 69–70). Saunders returned to work on March 29, 2012 and Plaintiff attempted to inform him, but he claims Saunders cut him off as soon as he heard it involved events on a day he was off work and not the manager responsible. (*Id.* at 214). Plaintiff's wife attempted to contact Saunders, Busch, and Thompson by telephone multiple times between April 18, 2012 and July 31, 2012 but was unsuccessful each time. (Doc. 43, Ex. 42 at ¶¶ 45–49). Plaintiff testified that he actually spoke with Saunders at the end of July 2012, around the same time his wife testified she was unable to reach Busch and Thompson, but Plaintiff's testimony gave no indication that he attempted to inform Sharp of the injury during that call. (Doc. 42 at 169; Doc. 43, Ex. 42 at ¶ 48).

"An employee's bare assertion that the employer's proffered reason has no basis in fact is insufficient to call an employer's honest belief into question, and fails to create a genuine issue of material fact." *Seeger*, 681 F.3d at 285. Here, Plaintiff's evidence only demonstrates a series of unsuccessful attempts to report

his injury. Defendants have produced substantial evidence that they honestly believed that Plaintiff did not report the injury, and Plaintiff does not question their decisional processes. The determinative question is not whether Plaintiff actually reported his injury, but whether Defendants reasonably and honestly believed that he failed to report it. *Seeger*, 681 F.3d at 286. Plaintiff's *argument* is not sufficient to call Defendants' proffered reason into question.

■ Plaintiff next argues that Defendants' proffered insubordination reason is false because Saunders obtained an incident report by October 24, 2012. Plaintiff refers to a document emailed to Saunders on October 24, 2012 that Saunders referred to as an "incident report." (Doc. 47, Ex. 47). This document was produced by a representative at Gallagher Bassett, Waste Management's third-party administrator for insurance claims, and was based solely on information he provided over the phone. (Doc. 30 at 9; Doc. 37 at 144). The representative entered the information Saunders provided into an Ohio Bureau of Workers' Compensation first injury report template. (Doc. 30 at 9; Doc. 37 at 143; Doc. 47, Ex. 47). The actual report Saunders received was only able to provide that Plaintiff "sustained a re-aggravation of previous back injury due to loading trash" and listed the date of the accident as October 23, 2012. (Doc. 47, Ex. 47 at WM 4470).

This does not demonstrate that Defendants' proffered reason is false. The report Saunders received on October 24, 2012 is a completely separate document than the injury report Plaintiff declined to complete on October 23 and October 26, 2012. (Doc. 42, Ex. 13; Doc. 47, Ex. 47 at WM 4470). An injury report provides first-hand information about an incident. The report Saunders received actually serves to strengthen Defendants' proffered reason because it demonstrates how little information they knew at the time.

### 2. Proffered Reason Did Not Actually Motivate Employer's Conduct

■ Under the second prong of pretext, the "plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct *could* motivate dismissal." *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir.1994). It is an indirect attack on the credibility of the employer by "showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Id.* When an employee "does not admit the factual basis underlying [the employer's] proffered legitimate reason for his discipline, [this] eliminates the second category of pretext." *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir.2012)

First, Plaintiff contends that Defendants did not uniformly apply its disciplinary policies to other employees who failed to complete incident reports. Plaintiff correctly notes that "[e]vidence that the progressive-discipline policy asserted as a rationale for an employee's termination was not uniformly applied is evidence of pretext." *Lamer v. Metaldyne Co. LLC*, 240 Fed.Appx. 22, 33 (6th Cir.2007). However, the facts of this case present an entirely different situation than in *Lamer*, where the employer expressly invoked the progressive-discipline policy to terminate the employee, but then denied him the right to peer review that the employee handbook provided "must be made available to an

employee fired pursuant to the progressive-discipline system." *Id.*

Plaintiff identifies four employees who received written warnings for incidents which Defendants failed to produce a corresponding written incident report. However, a review of the written warnings reveals that the employees were disciplined for entirely different conduct than Plaintiff and the situations are not comparable. The written warnings document that each employee was disciplined for a safety violation, three of which caused property damage and one in which the employee injured his knee.[4] (Doc. 43, Ex. 18, 20, 23, 24).

Accepting as true Plaintiff's contention that the four employees failed to complete an incident report, the warnings still reveal that Waste Management was aware of the underlying incident shortly after it occurred because the warnings were issued between three and fourteen days later. Further, Plaintiff failed to produce any evidence that these employees were asked to complete an injury report and refused.

Plaintiff also fails to show that Defendants' did not uniformly apply its policies. *See Kimble v. Wasylyshyn,* 439 Fed.Appx. 492, 499–500 (6th Cir.2011). In *Kimble,* the prospective employee demonstrated that the employer failed to uniformly apply its policies in making hiring decisions by producing evidence that the employer added an element to a job description after the job posting closed and then placed a "sudden emphasis" on this element it previously ignored. *Id.* Plaintiff has not made a similar showing here, such as evidence that Defendants placed a sudden emphasis on documenting safety issues. The termination of Krieger demonstrates that Defendants took the issue seriously, well before Plaintiff engaged in his protected activity.

Finally, the employee handbook provides "each situation will be evaluated on a case-by-case basis and may result in escalating the progressive corrective action to a higher level, up to and including termination of employment on the first or second offense." (Doc. 42, Ex. 17 at 36). The handbook provided no such discretion in *Lamer,* and there is no evidence that Plaintiff engaged in similar conduct with impunity before his protected activity only to be disciplined for the same conduct subsequently. *Green v. Wal–Mart Stores,* No. 3:11–cv–440, 2013 WL 3223629, at *7– 8, 2013 U.S. Dist. Lexis 89019, at *18–21 (S.D.Ohio June 25, 2013).

### 3. *Insufficient to Warrant Termination*

To establish that Defendants' proffered reason was insufficient to actually warrant his termination, Plaintiff must show by a preponderance of the evidence that "other employees, particularly employees not in the protected class, were not fired even though they were engaged in substantially identical conduct to that which the employer contends motivated its discharge." *Blizzard v. Marion Technical Coll.,* 698 F.3d 275, 286–87 (6th Cir.2012). Plaintiff must produce evidence that other employees "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* Comparison must to be employees who committed "acts of compa-

---

**4.** The injured employee filed for workers' compensation before he received the written warning, which Plaintiff argues amounts to evidence of other retaliation. The employee provided unrebutted testimony that he immediately called Saunders to report the injury and filled out an incident report later that day. (Doc. 38 at 49). The employee also knew that he would receive a written warning based on the conversation he had with Saunders before he filed his workers' compensation claim. (*Id.* at 61).

rable seriousness" and the conduct must be of similar "severity and frequency." *Id.* at 287.

■ In *Hale v. ABF Freight Sys., Inc.,* 503 Fed.Appx. 323 (6th Cir.2012), the employee showed the proffered reason was pretext because the "conduct for which he was disciplined and eventually terminated was common and accepted practice before and after his termination." *Id.* at 334. Plaintiff attempts to shoehorn that holding into the facts of this case by claiming that managers regularly ignored employee injuries. However, the testimony Plaintiff cites demonstrates that managers drew a bright line between the general aches and pains of the job and an injury attributable to a specific event. Plaintiff highlights Saunders' testimony that "[e]very driver complains of soreness" and that it was an unavoidable aspect of the job. (Doc. 29 at 38). Saunders also testified that Plaintiff in particular "always had some hurting, [and] complained of soreness" on a "frequent" basis, and that he would not ask Plaintiff to complete an incident report in response. (Doc. 29 at 37, 40). However, Saunders testified that he categorically differentiated between general complaints of soreness and complaints of a specific injury, stating "I didn't ask him to fill out an incident report unless he reported a specific injury or accident." (Doc. 29 at 40, 42–43).

Plaintiff identifies three different employees whom Profitt acknowledges he observed walking with a limp or made general complaints to him about "common aches and pains" that developed "over time" from the cumulative toll of up to forty years on the job. (Doc. 33 at 100–01). Profitt acknowledged that he never asked these employees to complete an incident report based on these complaints of aches and pains, but he testified that he would require a written report if an employee ever referred to "a specific event" or mentioned that he hurt himself on the job. (Doc. 33 at 100–01, 153–54).

Plaintiff identifies another instance in which an employee informed Profitt of a specific, on the job injury caused by another employee and Profitt did not request an incident report. (Doc. 39 at 28). The employee notified Profitt of his injury the same day because he believed that "if you have an incident, it's your job, no matter how small it is, to report it to your supervisor [and] if I didn't, I would be fired on the spot." (Doc. 39 at 25–26). Upon notification of the injury, Profitt immediately required the other employee to explain what occurred from his perspective. (Doc. 39 at 28). Only after he questioned both employees about the event did he determine that the incident did not warrant further action in the form of an incident report. (*Id.*)

Next, Plaintiff argues that Saunders failed to report the incident that culminated in Krieger's termination. The underlying incident occurred on November 2, 2010, and Saunders became suspicious and began to investigate with another manager. (Doc. 29 at 182–86). It is undisputed that the district manager, whom Profitt replaced shortly thereafter, was aware on the incident by November 5, 2010. (Doc. 47, Ex. 8). Even if Saunders did not make a written report until ten days later when an unknown person requested his version of events in writing, the situations are not comparable because Plaintiff waited seven months. Further, the fact that someone requested that Saunders' written account underscores that the company was aware of the incident. Finally, Saunders readily complied with this request to provide a written report, unlike Plaintiff, and avoided potential discipline for insubordination.

Plaintiff also identifies one employee whom he alleges received a lesser sanction

for a more serious incident. This employee violated a Life Critical Rule and the employee handbook provides that a final written warning with a three-day suspension is the default discipline for a violation, but Saunders ultimately issued just the final written warning. (Doc. 33, Ex. 37 at 36; Doc. 56, Ex. 25). As Profitt and Busch testified, all discipline is handled on a case-by-case basis. (Doc. 33 at 118; Doc. 36 at 90–92).

Plaintiff relies on a line of cases holding that an employee can demonstrate pretext based a comparison to discipline received by others for similar or more serious conduct. *Madden v. Chattanooga City Wide Serv. Dep't*, 549 F.3d 666 (6th Cir.2008). For example, in *Madden* the plaintiff brought a suit for racial discrimination and offered evidence that "white employees were not fired—or disciplined whatsoever—despite engaging in substantially identical conduct to the conduct for which Madden was fired." *Id.* at 676. That plaintiff made a sufficient showing that the employer's reason was pretext because he "introduced substantial evidence that the other incidents involved comparable or even more serious misconduct." *Id.*

Here, Plaintiff only identifies one other incident and has produced very little supporting evidence to help overcome the small sample size. The Waste Management employee received a slight reduction to the default discipline provided by the handbook, unlike the employees in *Madden* who escaped all discipline. *Madden*, 549 F.3d at 676. Busch also testified to an "extenuating circumstance" involved in the discipline of the employee, which further undermines any basis for a comparison. (Doc. 36 at 124). Managers only discovered the safety violation because of a recently-installed video recorder in the trucks, which Busch testified came with a "grace

period as far as some of the corrective actions go" and that this explained "why the discipline was not administered as normal." (*Id.*) Plaintiff produced no further evidence from which a reasonable jury could conclude that Defendants' proffered reasons are pretext.

Plaintiff's ultimate burden is to provide evidence that could lead a reasonable jury to find that Defendants' proffered reasons for terminating him are pretextual. *Davis v. Cintas Corp.*, 717 F.3d 476, 492 (6th Cir.2013). Plaintiff has not met this burden. Accordingly, Defendants are entitled to judgment as a matter of law.

## VI. CONCLUSION

For these reasons, Defendants' motion for summary judgment (Doc. 41) is **GRANTED** and Plaintiff's cross motion for partial summary judgment (Doc. 43) is **DENIED.**[5] The Clerk shall enter judgment accordingly.

**IT IS SO ORDERED.**

---

5. The motions in limine addressed to trial issues are terminated as moot.