NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0688n.06

No. 10-3110

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| JAMES E. KIMBLE, | ) | **FILED** |
|  | ) | ***Sep 28, 2011*** |
| Plaintiff-Appellant, | ) | LEONARD GREEN, Clerk |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| MARK WASYLYSHYN, individually and in | ) | ON APPEAL FROM THE UNITED |
| his official capacity as Sheriff of Wood | ) | STATES DISTRICT COURT FOR THE |
| County; BOARD OF WOOD COUNTY | ) | NORTHERN DISTRICT OF OHIO |
| COMMISSIONERS; JIM CARTER; TIM | ) |  |
| BROWN; ALVIN PERKINS, in their official | ) |  |
| capacity as Commissioners of Wood County, | ) |  |
| Ohio, Board of Wood County Commissioners, | ) |  |
|  | ) |  |
| Defendants-Appellees. | ) |  |

Before: SUTTON and COOK, Circuit Judges; GREER, District Judge.[*]

COOK, Circuit Judge. Wood County Deputy James Kimble appeals the district court's grant of summary judgment to the defendants in this employment-based racial-discrimination action. Because we conclude that Kimble presented sufficient circumstantial evidence from which a reasonable jury could find the defendants' proffered hiring rationale pretextual, we reverse the district court's judgment and remand the case for trial.

---

[*]The Honorable J. Ronnie Greer, United States District Judge for the Eastern District of Tennessee, sitting by designation.

I.

This dispute arises from allegations that the Wood County Sheriff's Office (the "Office") racially discriminated against Kimble, an African American, when considering candidates for an internal promotion. The current County Sheriff, Mark Wasylyshyn, assumed his role in January 2005. Per Wasylyshyn's own testimony, upon taking office, he and his Chief Deputy, Eric Reynolds, sought to overhaul many of his predecessor's management policies. Of particular relevance, Wasylyshyn states that he intended to take a more aggressive stance on enforcement activities (e.g., writing tickets and making arrests) and implement more formalized hiring procedures.

Eighteen months into Wasylyshyn's term, Sergeant Bill Frankart of the Office's Road Patrol Division announced his early retirement, thereby creating an opening for an Environmental Sergeant. The Environmental Sergeant's duties included enforcing solid-waste laws, inspecting junkyards, and supervising the deputy in charge of the inmate litter-control crew. Prior to his departure, Frankart, who employed Kimble part-time in his recycling business, met with Chief Deputy Reynolds to discuss potential replacements. At that time, Kimble had worked in the Office nearly seventeen years—having spent the last nine as a Road Patrol Deputy—and expressed interest in the position. Frankart thus told Reynolds about Kimble, stating that he would "make an excellent choice"; Reynolds, however, responded with "something to the effect that he didn't think so."

Reynolds officially posted the Environmental Sergeant opening at the end of August, but restricted it to current sergeants, none of whom was African American.[1] Shortly after Reynolds announced the opening, Wasylyshyn approached Sergeant Jim Shank and encouraged him to apply. Shank refused for personal reasons, but also recommended Kimble—whom he had overseen on road patrol—for the position, since Kimble was trained in litter enforcement. Though Shank assured Wasylyshyn that he "really never had any problems with [Kimble]," the Sheriff stated that "he really didn't want [him] to have that position," and preferred somebody who would "go out and write some tickets."

When the posting period closed without any submissions, Reynolds extended the deadline and opened the position to deputies. He included several requirements in the job description: (1) at least five years' road-patrol experience; (2) a valid commercial driver's license, to be obtained within six months of receiving the position; (3) flexible days and hours; (4) record-keeping and statistic-development abilities; (5) computer experience; (6) public-speaking ability; and (7) no recent disciplinary issues. Deputy Kimble, who had the requisite experience and a commercial driver's license and considered himself otherwise qualified, applied for the position the first day it opened to him.

---

[1]The Office employs two African Americans among its roughly 122-member workforce: Deputy Kimble and another individual, a corrections officer. This 2-in-122 figure closely mirrors the demographics of Wood County as a whole.

Also during this second posting period, the Office's Human Resources Representative, Joneal Bender, solicited applications from three deputies who passed through her office, even though none expressed interest in the position. In one instance, the would-be applicant, Deputy Tom Otley, told Bender that he lacked road-patrol experience and computer skills—both stated requirements for the position. Bender offered to draft a letter of interest for Otley and later did so, even though Otley expressed doubt about signing the letter and provided no input on the letter's content. After their conversation, Bender escorted Otley to Reynolds's office to discuss the position further. When Otley again explained his shortcomings, Reynolds assured him that he was "the most qualified for the job," and offered to "help" him with his deficiencies. Despite this generous assistance, Otley, like the other two deputies Bender approached, ultimately declined to apply.

On the posting period's final day, Deputy Rodney Konrad, an eight-year veteran with the Office, submitted a letter of interest to Bender. Prior to applying, however, Konrad met with Reynolds to discuss his application because he realized he lacked a few months of the required road-patrol experience. After talking to Konrad, Reynolds presented the matter to Wasylyshyn, who decided to waive the requirement for him. At that point Reynolds encouraged Konrad "to go ahead and apply anyway."

When the posting period ended, Konrad and Kimble were the only applicants for the position. The Office scheduled interviews for early November and then compiled a five-member interview panel consisting of Ms. Bender, Chief Deputy Reynolds, Road Patrol Division Lieutenant William

Ervin, and two individuals from the County Government—County Administrator Andrew Kalmar and Solid Waste Management District Director Ken Rieman.

During the interviews, the panel asked Kimble and Konrad the same set of prepared questions. Each member took notes and scored the candidates according to a ten-category grading sheet that Wasylyshyn had prepared. After the question-and-answer session, the panel rated the candidates quite closely: in aggregate, Konrad received 200.5 points; Kimble received 194. Before discussing scores or recommendations, however, Reynolds distributed Law Enforcement Activity Reports ("LEARs"), detailing the two deputies' respective year-to-date citation and arrest statistics. Although enforcement rates were not among the selection criteria in the job posting, Bender requested that a lieutenant in the Road Patrol Division run the LEARs several weeks in advance, in preparation for the interviews. The reports showed that Konrad had issued more citations and made more arrests than Kimble. Reynolds then emphasized that high activity and enforcement levels were "the direction the sheriff wants." Upon receiving this new information, the panel took two votes: it voted three-to-two to recommend Kimble if Wasylyshyn "liked the program just the way it was," and four-to-one to recommend Konrad if Wasylyshyn "wanted to take a more strict law enforcement approach." Bender prepared a memo for Wasylyshyn explaining the panel's recommendations. Within days, the Sheriff announced to the Office that he was promoting Konrad; Konrad assumed the position a month later.

In April 2007, Kimble filed a complaint with the Ohio Civil Rights Commission (the "OCRC") alleging racial discrimination. After speaking with each member of the interview panel, the OCRC issued a determination letter finding "probable cause" for discrimination. A few months later, Kimble initiated this suit in the U.S. District Court for the Northern District of Ohio, claiming violations of (1) Title VII of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000e–2000e-17; (2) 42 U.S.C. § 1981; and (3) the Ohio Civil Rights Act, Ohio Rev. Code §§ 4112.01–4112.99. The defendants moved for summary judgment, which the district court granted following a hearing. *Kimble v. Wasylyshyn*, 687 F. Supp. 2d 703, 710–11 (N.D. Ohio 2009). In its memorandum opinion and order, the court concluded that although Kimble established a prima facie case of racial discrimination, he failed to show that the defendants' proffered reasoning for the hiring selection was pretextual. *Id*. Kimble appeals.

## II. Analysis

### A. Applicable Legal Framework

We review de novo a district court's grant of summary judgment. *Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the moving party meets its initial burden, the nonmovant must "designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks and citation omitted). "Where the record taken

as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). But in making our determination, we may not "weigh the evidence and determine the truth of [any disputed] matter," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); we must instead view the facts in the record and all inferences that can be drawn therefrom in the light most favorable to the nonmoving party, *Matsushita*, 475 U.S. at 587–88.

The same legal analysis applies to all of Kimble's claims, regardless of whether they arise under Title VII, § 1981, or the Ohio Civil Rights Act. *See Hollins v. Atl. Co.*, 188 F.3d 652, 658 (6th Cir. 1999). Because Kimble presents circumstantial (rather than direct) evidence of discrimination, we review his case under the *McDonnell Douglas* burden-shifting scheme. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973); *see also Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–56 (1981) (expounding upon *McDonnell Douglas*).

The parties concede that Kimble established a prima facie case of racial discrimination. *See, e.g.*, *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 391 (6th Cir. 2009). Sheriff Wasylyshyn accordingly provided three legitimate, nondiscriminatory reasons for the hiring decision: (1) he preferred candidates with high activity, initiative, and self-motivation; (2) he sought the most qualified applicant for the position; and (3) he wished to focus on greater enforcement within the division. Under *McDonnell Douglas*, Kimble must now show that Appellees' proffered reasons are pretextual by providing "sufficient evidence from which the jury [could] reasonably reject the

employer's explanation." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2352 (2009), *as recognized in Geiger v. Tower Auto.*, 579 F.3d 614, 621 (6th Cir. 2009). A plaintiff may meet this burden either "by persuading the court that a discriminatory reason more likely motivated the employer," or "by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256. But in either case, he must do so by producing additional evidence rather than mere conjecture. *Manzer*, 29 F.3d at 1084.

Kimble responds indirectly, by offering various items of circumstantial evidence in an attempt to refute Appellees' purported hiring rationale. In this instance, a jury may "infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000). As the Court explained,

> [p]roof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt." Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.

*Id.* at 147 (citation omitted). Our question thus becomes whether Kimble's prima facie case and circumstantial evidence could lead a reasonable jury—if it accepts his factual allegations as true and

draws all inferences therefrom in his favor—to reject Appellees' proffered hiring rationale, thus permitting an inference that discriminatory intent truly motivated the decision. We believe that Kimble meets this burden.

B.      Kimble's Circumstantial Evidence

In his brief, Kimble highlights several facts that he believes call into question Appellees' articulated hiring rationale and instead reveal their true, discriminatory motive. Upon reviewing these assertions, we discuss his strongest arguments below.[2]

1.      Kimble was "pre-rejected."

First, Kimble argues that Wasylyshyn and Reynolds summarily rejected his candidacy based upon his race. Although an employer has great flexibility in choosing a management-level employee, *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987), evidence of preselection (or, presumably, as in this case, "pre-rejection") "operates to discredit the employer's proffered explanation for its employment decision," and "is relevant evidence of the employer's motivation," *Goostree v. Tennessee*, 796 F.2d 854, 861 (6th Cir. 1986).

---

[2]Kimble makes several other allegations, in addition to those that we examine: (1) that the Office delayed Konrad's start date a few weeks to allow him to gain requisite experience; (2) that the interview panel overlooked Kimble's past enforcement experience; and (3) that Wasylyshyn disregarded Kimble's higher interview scores for "enthusiasm and motivation," despite a supposed desire to hire "self-motivated" individuals. Although these latter claims may offer slight probative value, because we deem Kimble's other arguments adequate, we do not address them now.

In explaining how he was pre-rejected, Kimble stresses that both Reynolds and Wasylyshyn candidly opposed his supervisors' unqualified recommendations *before they had even seen Kimble's application materials*. But at the same time, Reynolds encouraged two Caucasian employees (Deputies Otley and Konrad) to apply, notwithstanding their professed inability to meet posted job requirements. In confronting this hurdle, Reynolds vaguely told one applicant he could "help" him with his shortcomings and, after consulting with Wasylyshyn, offered to waive requirements for the other.

In light of these facts, we believe that a reasonable jury could infer that the Office anticipatorily decided not to hire Kimble. The reasons for the Office's decision are unclear. For example, Shank's testimony might support Wasylyshyn's explanation that he wanted to focus on enforcement. Yet the fact that Wasylyshyn and Reynolds offered to overlook or waive stated job requirements for some (Caucasian) applicants casts doubt on the assertion that they sought "the most qualified applicant" for the job, or at least suggests that the stated requirements were not actually imperative. The more subjective Appellees' hiring decision, the more closely we must scrutinize their proffered rationales. *See Grano v. Dep't of Dev.*, 699 F.2d 836, 837 (6th Cir. 1983) ("[T]he legitimacy of the articulated reason for [an] employment decision is subject to particularly close scrutiny where the evaluation is subjective.").

2.      HR assisted unqualified candidates, but not Kimble.

Second, Kimble claims that Bender helped thwart his promotion prospects by building a pool of Caucasian applicants, regardless of whether they met the position's stated requirements. Though Bender encouraged at least two unqualified employees to apply for the position, we find her interaction with Deputy Otley—for whom she drafted a letter of interest and arranged a meeting with Reynolds—most questionable. In her defense, Bender claims she was new to the position and did not know whether every employee had the necessary qualifications. But this testimony conflicts with Otley's statement that he explicitly told her he lacked both road-patrol experience and computer skills.

In addressing this point, the trial court described Bender's actions as "[those] of a helpful Human Resources Manager." *Kimble*, 687 F. Supp. 2d at 710. Such a conclusion may oversimplify the situation. Providing an opportunity to one candidate in the hiring process, to the disadvantage of a competitor within a protected class, can serve as evidence of pretext. *See Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 351 (6th Cir., 1997); *Goden v. Runyon*, 885 F. Supp. 1104, 1108–09 (W.D. Tenn. 1995) (finding pretext where defendant-employer offered pre-interview subject matter training to a younger applicant, but not to an older applicant). Per Bender's own testimony, she was aware that Kimble was interested in the position on the day he submitted his materials—the day the posting opened. Yet she did not take him to see Reynolds or even forward his application until the deadline. Parsing these facts, we reason that a jury could infer that Bender provided preferential assistance to

certain applicants and overlooked (or even helped them surmount) their deficiencies, all to Kimble's detriment.

3. Only Kimble met the job's posted requirements.

Third, Kimble points out that at the time of the posting of the Environmental Sergeant position, he was the most qualified applicant—at least in terms of its written requirements. Specifically, he possessed both the requisite road experience and a commercial driver's license (although the posting stated that applicants had six months to attain the license). Meanwhile, Konrad had no license and lacked a few months' patrol experience. And, when Reynolds offered to "waive" the road-patrol requirement for Konrad, he did so very discreetly. He did not, for example, formally alter the posted job qualifications or mention the decision to the interview panel.

The district court dismissed this argument as "frivolous," stating that the Office did not intend for candidates to meet the job requirements before applying, but rather before assuming the position. But this reading conflicts with the posting's wording: "Any Road Patrol Deputies meeting above requirements . . . should submit a letter of interest . . . ." It does not say, "Any Road Patrol Deputies *who will soon meet* above requirements . . . ." Furthermore, Reynolds and Wasylyshyn's actions belie such an interpretation: if Konrad were eligible, why did they need to "waive" the road-patrol requirement for him? And why did they withhold this waiver from the interview panel? We believe that a reasonable jury, accepting these allegations as true, could conclude that the two willingly overlooked their own requirements to promote favored candidates—again calling into

question the objectivity of their assessment and furthering inferences of discrimination. *See Grano*, 699 F.2d at 837 (recognizing that "subjective evaluation processes intended to recognize merit provide ready mechanisms for discrimination" and thus call for close judicial scrutiny). Additionally, these actions appear to undermine Appellees' purported desire to "select the best candidate for the job."

4.      Enforcement rates were not part of the job description.

Fourth, Kimble highlights that after the panel completed its interviews, Chief Deputy Reynolds distributed enforcement activity reports and encouraged the panel to consider them when choosing between the candidates. Enforcement statistics and activity levels were nowhere in the job posting's requirements or description. Ultimately though, these numbers proved outcome determinative, as the panel's scenario-dependent recommendation suggests. Kimble argues that the numbers were the product of retroactive data mining, meticulously selected to "tip the scale" in Konrad's favor.

In discussing this contention, the district court noted that the allegation "bolsters rather than undermines" Appellees' position, and applauded the Office for developing "a valid way to distinguish the candidates." *Kimble*, 687 F. Supp. 2d at 709. Again, however, this observation makes light of Kimble's argument; he complains not that the Office used LEARs, but rather that it did so spontaneously and without warning to candidates or panel members. Office personnel prepared these lists weeks before the interview. Why then could they not advise the panel and

interviewees that the LEARs might be consulted to settle a "tie"?  We recognize that "employers are *not* rigidly bound by the language in a job description."  *Browning v. Dep't of the Army*, 436 F.3d 692, 696 (6th Cir. 2006).  Still though, other circuits have held that an employer's departure from the selection criteria in a job announcement to the detriment of a minority employee can be probative of discrimination.  *See  Courtney v. Biosound, Inc.*, 42 F.3d 414, 421 (7th Cir. 1994) (denying the employer's motion for summary judgment in an age-discrimination case where the job description failed to mention a requirement that the employer later claimed was essential); *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1225 (2d Cir. 1994) (same).

In response, Appellees argue that "every employee . . . had reason to assume that activity levels would be considered."  Yet this presumptive stance unfairly burdens the applicant to anticipate the employer's expectations.  Indeed, Wasylyshyn himself conceded that this "important factor" should have appeared in the job posting.  Thus, although the use of LEARs may have been an objective means of distinguishing between two qualified candidates, a jury might just as easily conclude that the data was prepared well in advance (as it indisputably was), then sprung upon the interview panel (again, as it indisputably was) to help ensure that Konrad received their recommendation.

5.      Earlier decisions overlooked enforcement rates.

Fifth, Kimble emphasizes that despite Wasylyshyn's professed desire to increase enforcement activity, in the last departmental promotion, the Sheriff selected Timothy Spees, a candidate whose

LEARs were among the lowest in the applicant pool. Kimble argues that this sudden emphasis on activity levels is thus contrived. An employer's failure to uniformly apply the policies it cites as the basis for its hiring and firing decisions can demonstrate prextext. *See Harrison v. Metro. Gov't*, 80 F.3d 1107, 1117 (6th Cir. 1996), *abrogated on other grounds by Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 20 (1993), *as recognized in Jackson v. Quanex Corp.*, 191 F.3d 647, 667 & n.6 (6th Cir. 1999); *accord Lamer v. Metaldyne Co.*, 240 F. App'x 22, 33 (6th Cir. 2007).

In response to this contention, the trial court noted that according to Shank and Wasylyshyn, Spees was head-and-shoulders above the other candidates, such that the panel did not need to resort to LEARs as a "tie-breaking" mechanism. *Kimble*, 687 F. Supp. 2d at 710. Moreover, Appellees note that Spees was promoted to Road Patrol Shift Sergeant, which, according to Wasylyshyn, is "not an enforcement position." Yet this latter argument conflicts with the testimony of Shank, who agreed that on road patrol, "one of the main functions, if not the most important function, is . . . activity levels on the road," (i.e., enforcement activity) and that the Office thus sought "somebody proactive."

Although the trial court's explanation—that LEARS were only a means of deciding between two closely qualified candidates—is workable, Kimble's argument casts doubt on the sincerity of Appellees' motives, as well as the objectivity of their procedures. After all, if enforcement really were that important to Wasylyshyn, why would he not consider it in all hiring decisions? A jury

could reasonably disbelieve Wasylyshyn's proffered explanation, providing further evidence from which a jury might reject the Appellees' stated hiring rationale.

6.      The OCRC found probable cause for discrimination.

Finally, Kimble directs us to the OCRC's report, in which the agency concluded that it was "probable that [Appellees] engaged in an unlawful discriminatory practice." Although the OCRC's report is not dispositive, *see Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 469–70 (1982), parties may generally admit such findings at trial, *Chandler v. Roudebush*, 425 U.S. 840, 863 n.39 (1976) ("Prior administrative findings made with respect to an employment discrimination claim may, of course, be admitted as evidence . . . ."). Moreover, the agency's probable cause finding should receive "substantial weight." *Wrenn*, 808 F.2d at 499; *accord Cooper v. Phillip Morris, Inc.*, 464 F.2d 9, 12 (6th Cir. 1972). The OCRC's determination is an additional piece of circumstantial evidence for the jury to consider, and it furthers Kimble's cause.

7.      The totality of the evidence allows an inference of discrimination.

As our past discussion suggests, this case involves a detailed fact pattern and highly particularized allegations, frustrating our attempts to find perfectly analogous case law. Precedent supports the notion that each of Kimble's assertions regarding the Department's handling of his application can suffice individually to thwart a defendant's proffered rationale. And, when we consider the totality of the evidence—(1) Kimble's "pre-rejection"; (2) HR's recruitment of

unqualified candidates; (3) Reynolds's and Wasylyshyn's undisclosed decision to "help" certain applicants with requirements or "waive" requirements altogether; (4) the sudden introduction of enforcement statistics at the end of the interview process; and (5) the OCRC's probable cause finding—it too must suffice, leaving us with a strong suspicion of race-based preference. Moreover, we emphasize that at the summary judgment stage, Appellees face a very high burden: "If the plaintiff[] ha[s] made out a prima facie case of discrimination, the defendant can be awarded summary judgment *only if no reasonable jury* could conclude that the reasons offered for the [detrimental employment action] were only a pretext hiding a discriminatory motive." *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 620 (6th Cir. 2006) (emphasis added). And because we find that Kimble's evidence creates a compelling narrative that casts doubt upon Appellees' professed hiring rationale, we are unconvinced that *no reasonable jury* could find in his favor.

## III. Conclusion

For these reasons, we reverse the district court's grant of summary judgment and remand the case for trial.