**NOT RECOMMENDED FOR PUBLICATION**
File Name: 20a0186n.06

Case No. 19-1773

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Mar 31, 2020
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| GREGORY STOKES, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE EASTERN DISTRICT OF |
| | ) | MICHIGAN |
| DETROIT PUBLIC SCHOOLS, | ) | |
| | ) | **OPINION** |
| Defendant-Appellee. | ) | |
| | ) | |

BEFORE: GRIFFIN, WHITE, and NALBANDIAN, Circuit Judges.

NALBANDIAN, Circuit Judge. Gregory Stokes worked for Detroit Public Schools (DPS) for almost ten years. In his last position, he worked as the Acting Deputy Executive Director to the Executive Director of Human Resources. He signed a six-month contract to serve in that role. Near the end of his contract, Stokes applied for a job as the Executive Director-Talent Acquisition. After interviewing three candidates, including Stokes, DPS hired a twenty-eight-year-old female instead. And DPS did not move Stokes to another position after his contract expired, ending his employment with DPS. Stokes filed this lawsuit, alleging failure to promote and unlawful discharge because of gender in violation of Title VII and Michigan's Elliott-Larsen Civil Rights Act (ELCRA) and age in violation of the Age Discrimination in Employment Act (ADEA) and ELCRA. The district court granted DPS's motion for summary judgment. Because Stokes has shown a genuine issue of material fact as to pretext for his Title VII and ADEA claims, we

1

REVERSE and REMAND.  But since he has failed to meet his burden of showing pretext under Michigan law for the ELCRA claims, we AFFIRM the district court's decision to grant summary judgment to DPS on those claims.

I.

Stokes started working for DPS in 2006 as the Human Resources (HR) Administrator to the Executive Director of HR and became the Talent Acquisition Manager to the Executive Director in 2010.  Though acting with different titles, his duties remained the same in both roles.  He advertised job opportunities, posted openings, helped oversee the interview processes, screened resumes, corresponded with candidates, attended job fairs, and interpreted the collective bargaining agreement, to name a few responsibilities.

DPS then promoted Stokes in 2013.  He became the Interim Executive Director to the Chief HR and Labor Relations Officer and then the Acting Deputy Executive Director to the Executive Director of HR in July 2015.  Interim Executive Director and Acting Deputy Executive Director consisted of the same responsibilities, again just under different titles.  In these roles he supervised a recruitment team, helped the school district implement an enhancement of the HR system, acted as a liaison between DPS and colleges to identify talent, worked with Teach for America to identify talent, acted as a liaison between the unions and the school district, screened resumes, coordinated the interview process, and onboarded new employees.

When he accepted the Acting Deputy Executive Director title, Stokes signed an employment agreement that said he would serve in that position for a six-month term, from July 1, 2015 until December 31, 2015.  On October 22, 2015, the Emergency Manager of DPS, Darnell Earley, sent Stokes a letter reiterating to him that his contract would expire on December 31, 2015 because of "[e]conomic [n]ecessity and/or [] [r]eorganization."  (R. 16-6, Letter, PageID 843.)

2

Earley encouraged Stokes to apply for a teaching position or another administrative position. Stokes had received similar letters with largely the same content for two years, since he became Interim Executive Director to the Chief HR and Labor Relations Officer. Yet DPS always renewed his position, so this October 22 letter didn't seem meaningful to him.

Around the time Stokes's title changed to Acting Deputy Executive Director, DPS contracted with The New Teacher Project, Inc. (TNTP), a consulting group, to help restructure how the school district was run. DPS and TNTP executed a contract on June 15, 2015, and the two amended the contract in 2016. Some of TNTP's September 2015 to January 2016 goals included: (1) "[f]inaliz[ing] the central office structure," (2) "creat[ing] new job descriptions for the new central office structure[,]" (3) "[d]esign[ing] an application and selection process for central office hiring and provid[ing] direct support on prescreening, phone screening, and interviewing for select roles[,]" and (4) "[a]ct[ing] as a strategic advisor to the Division of [HR] on the implementation of central office reductions." (R. 16-7, First Am., PageID 850–52.) So TNTP, not DPS, mainly held responsibility for eliminating Stokes's position, creating the new Executive Director-Talent Acquisition (EDTA) position, and interviewing for the EDTA position.

Chanel Hampton, a twenty-eight-year-old female, external applicant, applied to DPS for the job of Deputy Superintendent of Talent on November 3, 2015. She submitted her cover letter and a resume,[1] but seemingly did not submit transcripts from schools she attended. Her resume

---

[1] Stokes argues that Hampton "padded" her resume because some of her jobs overlapped in different cities. Nicholas Denton-Brown, a Talent Acquisition Manager for TNTP, explained that all the jobs listed on her resume were compatible. Because of the way Teach for America works, he explained, she could have multiple roles at Teach for America at one time, while still teaching too. Errick Greene, Earley's Special Assistant, confirmed this as well.

showed that she had worked as a teacher for St. Louis Public Schools and in various positions at Teach for America.

A Talent Acquisition Manager for TNTP, Nicholas Denton-Brown, worked with DPS during this time. He helped recruit individuals for the new positions TNTP created for DPS during the restructuring. Denton-Brown and the others working to fill the EDTA role thought that Hampton did not meet the qualifications for the Deputy Superintendent of Talent position after seeing her application and speaking informally with her on the phone. But Denton-Brown thought she met the qualifications for the EDTA role and would fit the position well. So he redirected her to the EDTA job instead.

After Denton-Brown informally prescreened Hampton, Errick Greene, the Special Assistant to the Emergency Manager of the district, apparently prescreened her too.[2] According to an email, Greene and Emergency Manager Earley met with Hampton on December 3, 2015 and seemed to think she did not have the experience for the Deputy Superintendent position. But they "were both impressed by her" and wanted "to move her through the application/hiring process for the ED Talent position." (R. 15-14, Emails, PageID 392.) Denton-Brown learned of their interest in Hampton and worked with the TNTP Project Manager, Chris Henderson, to get the job posted quickly. This is because Hampton had another job offer at the time, and TNTP could not offer her a job before the job had posted. Hampton apparently did not submit a new cover letter geared toward the EDTA position.

TNTP posted the EDTA job from December 7 to December 11, 2015. Although DPS normally held job application periods open for ten to fourteen days at that time, TNTP chose to

---

[2] Denton-Brown said Greene would have screened Hampton. Greene, however, could not recall many circumstances surrounding this situation when opposing counsel deposed him years later.

keep the period open only for those five days. The day before TNTP closed the application period, TNTP Site Manager, Megan Allegretti, emailed Denton-Brown and mentioned in passing Denton-Brown's experience with creative writing. Denton-Brown responded: "[A]nd suddenly a dragon appeared, tendrils of smoke drifting from his molten nostrils, to drag off the interim ED of Talent to ensure that schools be could [sic] effectively staffed for all!" (R. 15-22, Emails, PageID 559.) Stokes, of course, was at the time Acting Deputy Executive Director to the Executive Director of HR, which was named Interim Executive Director shortly before. Allegretti then replied: "On that note, looks like you are the dragon for now. Just pulled Gregory's resume from PeopleSoft for ED, Talent. Only new resume added today. Let me know if you need anything else on moving William and Gregory forward." (*Id.*) Denton-Brown then said "Ugh!" (*Id.*) Chanel Hampton, Greg Stokes, and Will Lyons, who was an HR Manager with DPS, were the three applicants for the EDTA position at the close of business on December 11.

That same day, Chris Henderson, Denton-Brown, and Allegretti exchanged emails about making sure TNTP conducted the interview process fairly, given the "sensitivity" of Lyons and Stokes applying for the position too: "Given that Gregory and Will Lyons have applied for the ED Talent position, I want to make sure we are on point procedurally so that our process can [be] defended and clear records are in place." (R. 15-25, Email, PageID 607.) And further into the email Henderson also said: "I think we'll be OK as look [sic] as we have clearly defined processes in place and Will and Greg both get interviews[.]" (*Id.*) He pointed out some bases they should cover beforehand, like providing interview rubrics to the panel, having the rubrics approved by the Executive Director of HR, training interviewers, collecting signed conflict of interest forms from phone screeners and interviewers, and collecting notes from Greene and Earley on their opinions of Hampton. Henderson also wanted to "obtain confirmation that [Hampton] does not need to go

5

through the process again." (*Id.*) Presumably he was referencing the pre-interview process. It appears Denton-Brown responded in part that he had "several examples of others not having to go through the same selectin [sic] process here so we have precedents, especially when [Emergency Manager Earley] has already interviewed folks." (*Id.*)

Denton-Brown conducted pre-screening interviews for Stokes and Lyons. Then Stokes, Lyons, and Hampton all interviewed for the job on December 18, 2015. Orma Smith and Greg Vary, both Deputy Network Leaders of Operation at DPS, and Errick Greene were the interviewers. The three interviewers received some degree of guidance on how to interview beforehand. And they signed interview guidelines and a document saying they understood the nepotism policy and had no conflicts of interest with any candidates. The parties did not produce a signed interview guidelines sheet for Errick Greene, however, and he does not recall signing one. Candidates had to receive an average score of 80 or above from these interviewers to be eligible for the position.

After the interviews, the interview panel recommended Hampton for the EDTA job. She received an average score of 83.6 from the interviewers, Lyons received an average score of 81, and Stokes received an average score of 63.3. Interviewer Vary filled out a scoring sheet for "Greg Stokes" and one for a "Will Stokes." But a sheet showing calculations of Vary's scores after the interview has "Greg Stokes" listed above the numbers that someone added up to 64[3] and "Will Lyons" listed above the numbers that someone added up to 84.[4] And the numbers in those two columns correspond to the numbers given for the eight subsections on the "Greg Stokes" and "Will

---

[3] Though a correct calculation of those values shows a total less than 64.

[4] Someone also incorrectly tallied this total. It should have been a 76 from Vary, meaning Will Lyons's average score should have been lower. To add to the confusion, in the final "total" box on Vary's "Will Stokes" scoresheet, someone (assumedly Vary) wrote a 64.

Stokes" scoresheets, respectively. Then on the final recommendation sheet from the panel, Vary's score for Greg Stokes reads 64 and his score for Will Lyons reads 84.

Cassandra Washington, the Executive Director of HR, explained that the interview process for the EDTA job consisted of several irregularities compared to how DPS conducted interviews before. She admitted that some inconsistencies like the ones in the EDTA interview process would normally require that the district interview the candidates again. But she also clarified that TNTP, not DPS, held responsibility for the EDTA interview process and that the application procedures and polices "were modified by the TNTP." (R. 15-10, Washington Dep., PageID 317.) She did not explain what procedures or policies TNTP modified, though. She noted that emergency managers can make decisions without restriction by district policies or procedures.

Hampton started the job shortly after she received the offer. DPS extended Stokes's contract one more month so that he could finish outstanding projects. He apparently helped familiarize Hampton with some of DPS's systems during this time too. According to Stokes, his retirement would have fully vested a few weeks after his job at DPS ended.

Stokes then filed this lawsuit, alleging unlawful discharge and failure to promote because of age under the ADEA and ELCRA and gender under Title VII and ELCRA. The district court granted DPS's motion for summary judgment on all claims. This appeal followed.

## II.

We review a grant of summary judgment de novo. *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606 (6th Cir. 2019). Viewing the evidence in the light most favorable to the nonmoving party, we affirm if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Redlin*, 921 F.3d at 606.

III.

Plaintiffs can use either direct or indirect evidence to support discrimination claims. When a plaintiff puts forth direct evidence, the factfinder need not draw any inferences to conclude that the employer wrongfully discriminated. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc). But if a plaintiff puts forth sufficient indirect evidence, we may "draw a reasonable inference that discrimination occurred." *Id.* When a plaintiff uses indirect evidence to support a claim under Title VII, the ADEA, or the ELCRA, the *McDonnell Douglas* burden-shifting framework applies. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see Geiger v. Tower Auto.*, 579 F.3d 614, 622, 626 (6th Cir. 2009) (applying *McDonnell Douglas* in the ADEA and ELCRA context); *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 706–07 (6th Cir. 2006) (explaining that *McDonnell Douglas* applies to Title VII single-motive claims).

Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination. Then the burden of production shifts to the defendant to show a legitimate, nondiscriminatory reason for the way it treated the plaintiff. If the defendant provides that reason, the burden of production shifts back to the plaintiff to show that the defendant's articulated reason was pretext for discrimination. *Miles v. S. Cent. Human Res. Agency, Inc.*, 946 F.3d 883, 887 (6th Cir. 2020).

For its summary judgment motion only, DPS conceded that Stokes presented a prima facie case for all his claims. So DPS next had the burden of showing a legitimate, nondiscriminatory reason for discharging and not promoting Stokes. DPS did. It says (1) that Stokes performed poorly in his interview and (2) he was not the best candidate for the job because DPS struggled to recruit new teachers while Stokes was Acting Deputy Executive Director. *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 392 (6th Cir. 2008) (noting that poor interview performance is a

8

legitimate, nondiscriminatory reason); *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 588 (6th Cir. 2002) (finding that not performing satisfactorily constitutes a legitimate, nondiscriminatory reason). So the burden of production shifts back to Stokes to show that DPS's reasons were pretextual. A plaintiff normally establishes pretext by showing that the proffered reason: (1) "had no basis in fact," (2) "did not actually motivate the employer's action," or (3) was "insufficient to motivate the employer's action." *Miles*, 946 F.3d at 888 (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)). But a plaintiff need not follow these categories rigidly. *Id.* Plaintiffs remain free to try to show pretext in whatever way they see fit. *Id.*

Stokes does not separate out his failure to promote and unlawful discharge arguments, so we analyze them as one.[5] Similarly, he mainly does not distinguish between his pretext arguments for gender and age discrimination, so we analyze his pretext arguments as applying to both sets of claims. But we do analyze his claims in the context of Title VII and the ADEA first and then the ELCRA second. And within our Title VII and ADEA analysis, we look separately at whether Stokes has shown that each of DPS's proffered reasons are pretextual. First, we look at DPS's claim that Stokes performed poorly during his interview. Second, we look to DPS's claim that TNTP did not believe that Stokes was the best candidate for the job because DPS continued to struggle to attract teachers with Stokes as Acting Deputy Executive Director.

Stokes's pretext arguments fall under the first and second pretext categories: that DPS's proffered reasons lacked a basis in fact or the reasons did not actually motivate DPS's actions.

---

[5] We fail to see how this case involves an alleged unlawful discharge, because Stokes was on a six-month contract. When a contract ends and an employee is not hired in a new position, of course they would be discharged from the company. But DPS has not argued that this claim lacks merit, so we treat it the same as Stokes's failure to promote claim.

IV.

A.

1.

DPS argues that it did not select Stokes for the EDTA position because of his interview performance. In response, Stokes says that the irregularities in the interview process constituted pretext for age and gender discrimination. Stokes provides evidence of irregularities during the process, compared to how DPS usually conducted other interviews. For instance, Hampton did not provide her transcripts, even though DPS had required candidates' transcripts for other positions in the past. And the application period closed after five days, which was shorter than normal. In addition, the interviewers allegedly did not unanimously decide to recommend Hampton for the role, even though the decision was supposed to be unanimous. Vary said to the best of his recollection, he liked Lyons more than Hampton. And no party has produced evidence of Greene's signature on the interview guidelines. What's more, a discrepancy occurred with Vary's scores. He filled out another scoresheet with the name "Will Stokes" and ultimately gave that individual an 84 (even though the final box said 64). Then he filled out a sheet for "Gregory Stokes," giving him a 64 after the tally. So Stokes argues that these discrepancies provide evidence of pretext, especially because Washington admitted that DPS would redo the interview process if some of these discrepancies occurred.

But DPS retorts that DPS hired TNTP to restructure the whole system, including the interview process, so no formal interview policy bound TNTP to perform this EDTA interview in a certain manner. Thus, TNTP could decide against requiring transcripts, redoing the interviews even if an initial scoring error seemed to exist, and so on.

10

Assuming TNTP had to follow these policies, and viewing the evidence in the light most favorable to Stokes, irregularities in a company's interview process alone do not constitute pretext sufficient to overcome summary judgment. *See Jenkins v. Nashville Pub. Radio*, 106 F. App'x 991, 995 (6th Cir. 2004) (finding that irregularities were only a factor toward a finding of pretext, not dispositive). "[A]n employer's failure to follow self-imposed regulations or procedures is generally insufficient to support a finding of pretext." *Miles*, 946 F.3d at 896 (quoting *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 246 (6th Cir. 2005)). What's more, *Briggs v. Potter* suggests that Stokes must show how the "irregularities prejudiced him in the selection process or indicate 'any dishonesty or bad faith' on behalf of" DPS. 463 F.3d 507, 516 (6th Cir. 2006) (quoting *Williams v. Columbus Metro. Hous. Auth.*, 90 F. App'x 870, 876 (6th Cir. 2004)). Here Stokes has failed to do so. He has not explained: why having Hampton's transcripts would have made a difference; why Vary's messed up scoring would have meant Stokes's weighted score would have been over 80; why a unanimous decision, instead of two of the three decisionmakers choosing him, would have meant that TNTP would have ultimately hired him for the role; or why Greene allegedly not signing the interview guidelines, but signing the conflict of interest sheet, would have changed the outcome. Thus, even assuming TNTP could not change the interview process and irregularities existed, these "inconsistencies . . . relate entirely to matters of process and have no bearing on [DPS's] reasons for not promoting [Stokes]." *Id.*; *see also Plumb v. Potter*, 212 F. App'x 472, 480–81 (6th Cir. 2007) (finding no pretext even though the employer did not follow two policies).

And these inconsistencies in the process do not show bad faith. TNTP found itself in a unique situation in which it had the task of restructuring the district, meaning differences in operation would understandably occur. Plus, it sought to fill a role where the usual person who

helped manage interviews was one of the candidates. So these variances in no way show bad faith on TNTP's part. Overall, these alleged irregularities do not rise to a level of establishing a genuine dispute as to pretext for Stokes's Title VII and ADEA claims.

2.

Stokes next argues that he possessed far better qualifications than Hampton for the EDTA role. Stokes argues that as Acting Deputy to the Executive Director, he had been performing the essential responsibilities of the EDTA position, and Hampton had only a few years of experience with Teach for America.

Qualifications evidence is "relevant to the question of pretext." *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 626 (6th Cir. 2006). In *Bender*, we clarified how this court assesses qualifications evidence:

> In the case in which a plaintiff does provide other probative evidence of discrimination, that evidence, taken together with evidence that the plaintiff was as qualified as or better qualified than the successful applicant, might well result in the plaintiff's claim surviving summary judgment. On the other hand, in the case in which there is little or no other probative evidence of discrimination, to survive summary judgment the rejected applicant's qualifications must be so significantly better than the successful applicant's qualifications that no reasonable employer would have chosen the latter applicant over the former. In negative terms, evidence that a rejected applicant was as qualified or marginally more qualified than the successful candidate is insufficient, in and of itself, to raise a genuine issue of fact that the employer's proffered legitimate, non-discriminatory rationale was pretextual.

*Id.* at 626–27 (citation omitted). What's more, a plaintiff's subjective assessment of his qualifications alone does not show pretext. *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004).

Yes, Stokes had more years working in HR or recruitment, as he emphasizes. But Hampton had actual teaching experience. So she could have better related to teachers applying to the district, known how to attract teachers to the district, and better understood which applicants were best

suited to become teachers. DPS (through TNTP) saw that Hampton might be able to bring fresh strategies and perspectives to the district, which may successfully help the district attract new teachers. A reasonable decisionmaker could find that Hampton was better suited for the job for these reasons. And "[i]f two reasonable decisionmakers could consider the candidates' qualifications and arrive at opposite conclusions as to who is more qualified, then clearly one candidate's qualifications are not significantly better than the other's. Thus, [the] qualifications evidence is not itself sufficient . . . to survive summary judgment." *Bender*, 455 F.3d at 628.

Stokes's subjective opinion that more years of working automatically means better qualifications does not suffice. When looking at two qualified applicants, DPS (through TNTP) made a business decision to select Hampton, with the thought that she might fill more teaching vacancies. So we will not call into question this hiring criteria. *See Browning v. Dep't of the Army*, 436 F.3d 692, 698 (6th Cir. 2006) ("Questioning the [employer's] hiring criteria is not within the province of this court, even if the [employer's] hiring process was entirely subjective."). Stokes has failed to show a genuine issue of material fact as to pretext for his Title VII and ADEA claims based on qualifications evidence.

3.

It's Stokes's last argument—that DPS (through TNTP) preselected Hampton for the EDTA position—that creates a genuine dispute as to pretext for Stokes's Title VII and ADEA claims. We have held that "preselection is relevant evidence of [an] employer's motivation," and it "operates to discredit the employer's proffered explanation for its employment decision." *Goostree v. Tennessee*, 796 F.2d 854, 861 (6th Cir. 1986). Because DPS planned to offer Hampton the position before the interview, Stokes has shown a genuine issue of material fact as to whether the interview scores were the actual motivation behind DPS not hiring him for the position. Stokes points to an

13

email sent by Denton-Brown on November 30, 2015, a few weeks after Hampton initially applied, in which he, among other things, asked members of his team where Hampton's status stood. He mentioned, "Ideally she would interview for [the Deputy Superintendent of Talent] role and, if strong but not quite qualified for that position as we and Errick Greene suspect, she would be *offered* the [EDTA] position." (R. 16-11, Email, PageID 1014 (emphasis added).) Saying that Hampton "would be offered" the position implies that TNTP preselected her. Stokes also points to an email from December 3, 2015 from Henderson to Emergency Manager Earley saying: "[Hampton] has a competing offer she needs to respond to, so if you think she is the right fit we will potentially have to keep her interested for a couple of weeks or find an alternative solution to bring her on board quickly." (R. 15-14, Emails, PageID 392.) And Stokes points to an email from Greene saying: "Mr. Earley would like to move [Hampton] through the application/hiring process for the ED Talent position. Obviously, we'd like to start and conclude the process as quickly as possible." (*Id.*)

Thus, Stokes has shown that TNTP may have preselected Hampton—or at least that a rational juror could make that finding. And this could "operate[] to discredit" DPS's claim that the poor scores from Stokes's interview motivated the decision to not renew his contract or not promote him because the preselection occurred before the interview. A jury could conclude that the interview scores were not the reason DPS did not pick Stokes for the EDTA role, because DPS selected Hampton weeks before. Since we've noted that preselection alone can refute a defendant's proffered reason, *Kimble v. Wasylyshyn*, 439 F. App'x 492, 500 (6th Cir. 2011), Stokes has shown that there is a genuine dispute regarding whether DPS's interview justification is pretextual.

So even though Stokes did not show pretext through the irregularities or qualifications evidence, he has provided enough evidence to show a genuine issue of material fact as to pretext through the preselection evidence.[6]

B.

DPS also contends that it did not hire Stokes for the EDTA position because Stokes was not the best fit for the role. DPS explains that it struggled to attract teachers while Stokes was Acting Deputy Executive Director, though DPS does not point to any specific records to support this. But Denton-Brown explained during his deposition that during the few years that Stokes filled the Interim Executive Director and Acting Deputy Executive Director positions, Stokes failed to fill hundreds of teaching vacancies in the district.

In response, Stokes explains that this issue never came up during his evaluations. He received a "satisfactory" rating in January 2015 for "[c]ompletes work assignments" and "[a]bility to follow through on a plan with minimal or no direction[.]" His ratings in June 2015 moved up to "commendable" for those two categories. He also received a "commendable" rating for the category that said, "meets established performance standards[;] does not produce substandard products or services[.]" And he received "exceptional" and other "commendable" ratings in other, less relevant categories. (R. 15-3, Evaluations, PageID 145–54.) The closest an evaluation came to showing that Stokes was not the best fit for the role because DPS still struggled to fill open teaching positions came from his June 30, 2015 evaluation:

---

[6] Stokes also argues circumstantial evidence of age discrimination through Vary's statements that Hampton was more "enthusias[tic]" and "energetic" than Stokes. (R. 23-18, Vary Dep., PageID 2463.) But as the district court correctly pointed out, the use of "enthusiastic" and "energetic" do not suffice to create a genuine issue of material fact as to pretext for age discrimination. *See Sander v. Gray Television*, 478 F. App'x 256, 266 (6th Cir. 2012); *see also Crabbs v. Copperweld Tubing Prods.*, 114 F.3d 85, 89 (6th Cir. 1997).

> Greg would be even more effective if he were more persistent and insightful in searching out the root cause of problems he encounters which impact quality and operations of TA (e.g., TA team's inability to accelerate the recruitment time line and develop an effective process for screening and on-boarding teachers).

(*Id.* at 151.) These evaluations support both sides. On one hand, Stokes performed well and had good evaluations. But at the same time, there is a question whether he filled teaching roles effectively, such that he was the right candidate for the EDTA job.

That being said, good evaluations are enough to overcome allegations of poor performance. *See Cicero*, 280 F.3d at 591–92 ("While [defendant] now says that [plaintiff] failed in several ways throughout his employment, it never raised any serious complaints about his performance until after it fired him."). Although DPS raised a complaint in that June evaluation, Stokes also received satisfactory, commendable, and exceptional ratings. So Stokes has shown a genuine issue of material fact as to whether DPS's reason—that Stokes was not the best fit for the role because DPS still struggled to attract teachers—was based in fact. Thus, Stokes establishing a prima facie case of discrimination, plus his showing of a genuine issue of material fact over the truthfulness of DPS's proffered reasons, is enough to survive summary judgment. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) (If a plaintiff makes out a prima facie case and provides "sufficient evidence to find that the employer's asserted justification is false," a trier of fact "*may* . . . conclude that the employer unlawfully discriminated." (emphasis added).)[7] So we reverse and remand on his Title VII and ADEA claims.

---

[7] We recognize that *Reeves* outlined rare occasions when a prima facie case plus the plaintiff refuting the employer's proffered reasons may still result in summary judgment for the employer:

V.

Unlike Title VII and ADEA claims, in which a plaintiff need only show pretext,

> Michigan law imposes a higher burden on plaintiffs after the employer has presented a legitimate, non-discriminatory reason for its employment actions. Specifically, Michigan law requires that the plaintiff show that the employer's stated reason is pretext for discrimination. In *Lytle*, the [Michigan Supreme] [C]ourt stated: [D]isproof of an employer's articulated reason for an adverse employment decision defeats summary disposition only if such disproof also raises a triable issue that discriminatory animus was a motivating factor underlying the employer's adverse action. In other words, plaintiff must not merely raise a triable issue that the employer's proffered reason was pretextual, but that it was a pretext for . . . discrimination.

*Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 438–39 (6th Cir. 2002) (third and fourth alterations in original) (citations omitted) (quoting *Lytle v. Malady*, 579 N.W.2d 906, 916 (Mich. 1998)). We noted that the Michigan Supreme Court decided *Lytle* before *Reeves* but found that *Lytle* still seemed to be good law in Michigan. *Id.* at 439; *see Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 522 (Mich. 2001).

Here, Stokes has shown no evidence that discriminatory animus motivated DPS's decision not to hire Stokes as EDTA. He's provided no indication that age or gender had anything to do with the decision. The best he can point to are Vary's statements that Hampton was "enthusias[tic]" and "energetic," but as described above, statements like that do not create a

---

> Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

530 U.S. at 148; *see Alberty v. Columbus Twp.*, 730 F. App'x 352, 360 (6th Cir. 2018) (applying this principle from *Reeves* in the summary judgment context). But DPS has not shown sufficient evidence to fall under those exceptions, so Stokes's prima facie case plus pretext is enough for him to survive summary judgment.

genuine issue of material fact over pretext.  So even though Stokes has shown a triable issue for his Title VII and ADEA claims, he has not for his ELCRA claims because he has shown no evidence suggesting discriminatory animus.

*     *     *

Thus, for his Title VII and ADEA claims, Stokes has shown a genuine issue of material fact as to whether Stokes's poor interview performance was pretextual because DPS (through TNTP) decided to offer Hampton the position even before the interview.  And there is a genuine issue of material fact as to pretext for DPS's claim that Stokes wasn't the best fit for the job because he failed to recruit enough teachers.  Because Stokes has shown a genuine issue of material fact as to pretext for all DPS's proffered reasons, *see Smith v. Chrysler Corp.*, 155 F.3d 799, 806, 809 (6th Cir. 1998), we REVERSE the judgment of the district court as to the Title VII and ADEA claims and REMAND for further proceedings.  But we AFFIRM the district court's decision as to the ELCRA claims.